742 P.2d 808

**ST. JOSEPH'S HOSPITAL AND MEDICAL CENTER, an Arizona corporation, Plaintiff/Appellee/Cross-Appellant.**

**v.**

**RESERVE LIFE INSURANCE COMPANY, a Texas corporation; United Chambers Administrators, an Illinois corporation; and United Chambers Insured Plans, Defendants/Appellants/Cross-Appellees.**

**No. CV 86–0414–PR.**

Supreme Court of Arizona, In Banc.

Sept. 3, 1987.

Gammage & Burnham by Richard B. Burnham and Richard K. Mahrle, Phoenix, for St. Joseph's.

Gene G. Gulinson, Scottsdale, for Reserve Life/United Chambers.

CAMERON, Justice

### I. Jurisdiction

St. Joseph's Hospital and Medical Center (St. Joseph's) petitioned this court for review of a court of appeals' decision and opinion, *St. Joseph's Hospital and Medical Center v. Reserve Life Insurance Co.*, 154 Ariz. 303, 307, 742 P.2d 804, 808 (App. 1986), reversing jury awards against Reserve Life Insurance Company, United Chambers Administrators and United Chambers Insured Plans (collectively referred to as "United Chambers") for negligent misrepresentation, promissory estoppel, and insurance bad faith. We have jurisdiction pursuant to Arizona Constitution, article VI, § 5(3); 17A A.R.S. Ariz.R. Civ.App.P., Rule 23.

### II. Issues

We answer the following questions on review: [1]

1. Was there sufficient evidence to support the jury's verdict on negligent misrepresentation?

2. Was there sufficient evidence to support the jury's verdict on estoppel?

### III. Facts

On 1 September 1981, George Montney, with the help of his business partner, David Holland, filled out an application for a group health insurance policy with United Chambers. Although no medical examination was required, the application form requested certain medical information, *i.e.*, height and weight, any doctors consulted within past five years, and any injury, sickness, treatment and results. Montney listed his height as 5′11″ and weight as 200 pounds. For doctors consulted, he listed only "Dr. Brite," for a physical and blood test.

Also on 1 September 1981, Montney consulted with Dr. Goldberger, an internist. Montney weighed approximately 240 pounds and was 5′9½″ tall. Dr. Goldber-

ger found a large mass in Montney's abdomen and another in his right thigh which was visible as well as palpable. Dr. Goldberger made an appointment the next day for Montney with a cancer specialist, Dr. Hood Franks.

Upon receipt of Montney's application, United Chambers issued a policy, effective 1 September 1981. United Chambers sent Montney a validation of coverage, a copy of the application, a certificate booklet, and an insurance information card. United Chambers instructed the insured to review the application and to notify United Chambers of any erroneous information. Montney never supplemented nor corrected the information in his application.

Dr. Franks diagnosed Montney as having chronic myelogenous leukemia. Montney was first treated by St. Joseph's on 8 September 1981 as an outpatient. On 14 October 1981, Montney was admitted to St. Joseph's on an emergency basis. To the hospital personnel upon admission, Montney stated that he had health insurance through United Chambers and presented his insurance information card. Printed on the back of the information card was:

NOTE TO HOSPITAL

If you wish to obtain claim forms—*or verify coverage*—please call or write the employer or service office named on the other side of this card.

(Emphasis added.)

The service office listed on the card's reverse side was Charles Maher & Assoc. (Charles Maher), Wheat Ridge, Co. at 1–800–525–8213.

The hospital's insurance verifier, Jean Schlect, used this information to contact the office of Charles Maher. Schlect told the insurance office's employee that Montney had been hospitalized and diagnosed as having leukemia, and asked whether he had coverage. Charles Maher's employee verified that a policy for Montney was in effect with a $100 deductible, 80% coinsurance to $5,000, then 100% to $1 million, but did not

---

**1.** Actually, we granted review on a third issue: Whether the court of appeals used the appropri-ate standard of review. We address that question while answering the two questions above.

relay any information regarding conditions on Montney's coverage.

United Chambers received St. Joseph's bill for Montney's October hospitalization on 11 November 1981. On 1 December, United Chambers wrote Montney asking for an attending physician's statement. The statement was received by United Chambers on 16 December 1981. On 23 December, United Chambers asked St. Joseph's to send Montney's records for the October hospitalization. Additional information was also requested from Dr. Goldberger. Later, a postcard was sent to St. Joseph's stating that United Chambers was seeking physician's records in addition to the hospital records.

Montney again was admitted to St. Joseph's on 4 January 1982; he stayed through 2 April 1982. On 5 January, Schlect contacted Charles Maher to verify coverage and received the same policy information as before.

When no payment had been made on Montney's bill for his October hospitalization as of 12 February 1982, Dorothy Diggins, a financial counselor from St. Joseph's, contacted the head office of United Chambers, in Illinois, to inquire as to the bill's status. On 16 February, United Chambers advised St. Joseph's that the claim was pending for information requested from Dr. Bright. Dr. Bright's records were received on 15 March. On 17 March, United Chambers wrote to a physician identified in Dr. Bright's records as having seen Montney prior to 1 September 1981. On 5 April, Diggins again contacted United Chambers to inquire about payment and received verification of Montney's coverage. On 12 April, Diggins was informed that United Chambers was still awaiting information from a doctor.

On 5 May, United Chambers wrote a letter to Montney rescinding his insurance policy. United Chambers stated that had Montney disclosed his true height and weight, the policy would not have been issued. Montney received the letter on 10 May, the same day he was readmitted to St. Joseph's. Nevertheless, when Schlect telephoned to verify Montney's coverage on 11 May, she again received the same coverage information as before. On 12 May, however, United Chambers advised St. Joseph's that Montney's policy had been rescinded. Montney died on 11 June 1982.

St. Joseph's sued United Chambers for the services rendered Montney. The jury returned a verdict for United Chambers on a breach-of-contract claim but returned a verdict for St. Joseph's for negligent misrepresentation, promissory estoppel and insurance bad faith. The jury awarded $93,-162.11 in compensatory damages to St. Joseph's for services rendered and $9,316.00 in punitive damages on the bad faith claim. The trial court, however, partially granted United Chambers' motion for judgment n.o.v. and reduced the award by the amount of charges incurred during the last hospital admission, approximately $27,000. United Chambers appealed to the court of appeals.

■ The court of appeals reversed the judgment for both compensatory and punitive damages, holding that there was insufficient evidence of either negligent misrepresentation or promissory estoppel and that the doctrine of bad faith does not extend to benefit third parties. We granted the hospital's petition for review of the opinion of the court of appeals concerning the issue of negligent misrepresentation and promissory estoppel but denied review as to the issue of insurance bad faith. We agree with the court of appeals' holding that the evidence was insufficient as a matter of law to support a judgment for bad faith and punitive damages. The evidence presented not only failed to establish a claim of bad faith under the standard enunciated in *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 723 P.2d 675 (1986), but also failed to support a judgment for punitive damages.[2]

---

**2.** In a motion filed subsequent to oral argument in this court, United Chambers urged that the plaintiff's state remedies had been preempted by federal law under § 502(a)(1)(B) of the Employ-ee Retirement Income Security Act of 1974. *See also* § 514(a) of the same Act; *Pilot Life Insurance Co. v. Dedeaux*, — U.S. —, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).

## IV. Discussion

Where the sufficiency of the evidence to sustain a jury's verdict is questioned on appeal from the judgment entered thereon, we must, under well-established rules, resolve every conflict in the evidence and draw every reasonable inference in favor of the prevailing party. *McFarlin v. Hall,* 127 Ariz. 220, 224, 619 P.2d 729, 733 (1980); *Harvey v. Kellin,* 115 Ariz. 496, 498, 566 P.2d 297, 299 (1977). We must view the evidence in a light most favorable to sustaining the verdict and if there is any substantial evidence from which reasonable men could have found ultimate facts to be such as will sustain the verdict, the judgment will be affirmed. *McFarlin,* 127 Ariz. at 224, 619 P.2d at 733; *Siegrist v. Carrillo,* 112 Ariz. 218, 222, 540 P.2d 690, 694 (1975).

We, therefore, consider whether St. Joseph's presented evidence sufficient to sustain the judgments entered on the jury's verdicts of negligent misrepresentation and estoppel.

### 1. Negligent Misrepresentation

The court of appeals recognized that the tort of negligent misrepresentation "is committed by the giving of false information intended for the guidance of others and justifiably relied upon by them causing damages if the giver of the false information fails to exercise reasonable care or competence in obtaining or communicating the information." 154 Ariz. at 305, 742 P.2d at 806.

In holding that St. Joseph's had insufficient evidence to support a claim of negligent misrepresentation, the court of appeals stated that "the only duty owed by United Chambers was to give true information of existing facts known to it in response to the request. This it did." United Chambers, the court of appeals stated, was under no obligation to comply with St. Joseph's time-table in completing its investigation and determining its liability to Montney for payment of his expenses. In addition to finding no breach of duty, the court of appeals held that the "hospital's assumption that payment would be made because a policy was issued was not justifiable reliance upon the information requested and obtained." At 306, 742 P.2d at 807. We disagree.

■ Arizona recognizes the tort of negligent misrepresentation. *See Van Buren v. Pima Community College District Bd.,* 113 Ariz. 85, 546 P.2d 821 (1976); *Arizona Title Ins. & Trust Co. v. O'Malley Lumber Co.,* 14 Ariz.App. 486, 484 P.2d 639 (1971). The tort is defined by *Restatement (Second) of Torts* § 552, which provides, in relevant part:

**552. Information Negligently Supplied for the Guidance of Others**

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

 (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

 (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Liability for negligent misrepresentation is narrow in scope because it is premised on the reasonable expectations of a foreseea-

We note that the preemption issue was not presented to the trial court, the court of appeals, nor to this court in the briefs or at oral argument. Although United Chambers promptly filed the motion after the United States Supreme Court decided *Pilot Life, supra,* that decision did not create the preemption issue, but only considered the issue, one of first impression. As the preemption issue was not raised timely, we do not reach it.

ble user of information supplied in connection with commercial transactions. *Restatement (Second) of Torts* § 552 comment a. A foreseeable user is defined by section 552(2) and is discussed in comment g. Often the foreseeable user of the information is the person who contracted with its supplier and paid the supplier consideration, in this case, the patient. In other cases, however, "the information is supplied directly to the person who is to act upon it although it is paid for by the other party to the transaction." *Restatement (Second) of Torts* § 552 comment g.

Not every user of commercial information, however, may hold every maker to a duty of care. The duty of care owed to the foreseeable user in supplying information for use in commercial transactions is a relative standard,

> defined only in terms of the use to which the information will be put, weighed against the magnitude and probability of loss that might attend that use if the information proves to be incorrect. A user of commercial information cannot reasonably expect its maker to have undertaken to satisfy this obligation unless the terms of the obligation were known to him. Rather, one who relies upon information in connection with a commercial transaction may reasonably expect to hold the maker to a duty of care only in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended to supply it for that purpose.

*Restatement (Second) of Torts* § 552 comment a.

■ Applying the *Restatement* to the facts of the instant case, the evidence supports the following findings. In contracting for insurance, Montney paid consideration to United Chambers. As part of the insured's coverage, United Chambers invited hospitals to verify insurance coverage so that the insured upon admission to a hospital would not have to guarantee, through deposit or credit, payment for services to be rendered by the hospital:

Q. [Plaintiff's attorney] Okay. Now isn't this insurance verification procedure not only of benefit to the hospital but also of benefit to your insured?

A. [United Chambers' employee] Yes.

Q. And how is it a benefit to the insured?

A. It's basically confirming the plan information in force at that time.

Q. So that he's not required to submit some kind of deposit?

A. Yes. Some hospitals are required if a person does not have any insurance.

In light of United Chambers' "Note to Hospital" invitation to "verify coverage", St. Joseph's was a reasonably foreseeable user. United Chambers' employees testified they knew that hospitals rely upon insurance verification calls in determining patient admissions:

Q. [Plaintiff's attorney] Now, you know that when the hospital calls in response to the offer you've made on that card, that they want to know whether there's a policy in effect that's going to cover the treatment of this particular patient; isn't that so?

A. [United Chambers' employee] I believe so.

Q. And that the hospital will be making a business decision regarding that patient based on the information it receives from you?

A. That's my understanding. They are calling to minimize any risks.

Moreover, evidence that United Chambers invited hospitals to telephone to "verify coverage" indicates that the insurer was aware that hospitals are interested not merely in billing information but in knowing whether the patient is "covered," i.e., whether the insured's bills will be paid. United Chambers' knowledge of the hospitals' intended use of the verification information allows St. Joseph's to hold United Chambers to a duty of care.

A reasonably foreseeable user of commercial information may reasonably expect that the supplier of information will observe the following standard of honesty:

"only that the maker of a representation speak in good faith and without consciousness of a lack of any basis for belief in the truth or accuracy of what he says." *Restatement (Second) of Torts* § 552 comment a. This standard of honesty is "unequivocal." *Id.*

██ Comment a of the *Restatement* suggests that a "standard of honesty" requires that when supplying commercial information, United Chambers had a duty to speak, not only in good faith, but also without consciousness that they lacked any basis for believing in the truth or accuracy of their statements. United Chambers did not require Montney to submit to a medical examination prior to issuance of the policy, and did not investigate the accuracy of his application until after a claim was submitted.[3] From the evidence presented, the jury may well have concluded that United Chambers should not have held itself out as having the ability to provide coverage information by inviting hospitals to telephone to verify coverage, if it knew that its underwriting practices did not place it in a position to respond accurately to a particular request. What is reasonable conduct in a particular case is usually to be resolved by the jury. *See* comment e ("It is, in general, a matter of the care and competence that the recipient of the information is entitled to expect in the light of the circumstances and this will vary according to a good many factors. The question is one for the jury, unless the facts are so clear as to permit only one conclusion.").

██ United Chambers agrees with a jury determination of reasonableness, but argues that the language from comment e, "the supplier will exercise that care and competence in its [the information's] ascertainment which the supplier's business or profession requires," establishes a professional standard of care in negligent misrepresentation cases. According to United Chambers, St. Joseph's failed to present expert witness testimony as to insurance business customs and practices regarding underwriting, and therefore, failed to prove a prima facie case of negligent misrepresentation. United Chambers' argument attempts to broaden the holding in *Powder Horn Nursery v. Soil and Plant Laboratory*, 119 Ariz. 78, 579 P.2d 582 (App. 1978). We do not agree with United Chambers' interpretation.

In *Powder Horn Nursery*, the nursery asked a laboratory to recommend a method of fertilization and soil mix to prevent the yellowing of leaves in the nursery's container-grown plants. The recommended fertilization resulted in increased yellowing and considerable damage to the plants. The nursery sued the laboratory, alleging that the laboratory's negligence in soil testing caused the plant damage.

The trial court awarded summary judgment against the nursery, stating, "the Plaintiff must establish that the Defendant failed to conform with a standard of care existing within the community. There is absolutely no evidence ... indicating any opinion by a qualified expert that the advice given by Defendant breached any existing standard of care." *Powder Horn Nursery*, 119 Ariz. at 80, 579 P.2d at 584.

The court of appeals agreed that the nursery failed to present expert-witness testimony as to the customs and practices of soil testing laboratories. The court affirmed the award of summary judgment, holding that "the law placed a duty upon the Lab to exercise the skill and knowledge normally possessed by members of that trade or profession" and that the nursery had not shown the Lab's breach of such a

---

3. St. Joseph's argues that United Chambers engages in post-claim underwriting. Post-claim underwriting "means that the carrier does not conduct any investigation of the insured's prior medical history until a claim in submitted. At that time, the insurer in an attempt to avoid liability, scrutinizes claimant's prior medical history for any nondisclosure of prior health problems." W. Shernoff, S. Gage, & H. Levine, INSURANCE BAD FAITH LITIGATION § 5.22[2] (1984). By this practice, critics argue, an insurer can place a large number of policies at little cost and realize high profits from the sales. When an insured submits a claim, the insurer then conducts an exhaustive investigation and denies the claim, thereby allowing the passage of time to root out the bad risks. *See USLife Credit Life Ins. Co. v. McAfee*, 29 Wash. App. 574, 577, 630 P.2d 450, 453 (1981).

standard of care. *Id.* at 82, 579 P.2d at 586. In reaching this conclusion, the court relied on *Kreisman v. Thomas,* 12 Ariz. App. 215, 469 P.2d 107 (1970), which held,

> Where, as here, the duty which the law recognizes arises because the defendant has held himself out to be trained in a particular trade or profession, the standard required for the protection of others against unreasonable risks is that the defendant exercise the skill and knowledge normally possessed by members of that trade or profession in good standing in similar communities.

12 Ariz.App. at 220, 469 P.2d at 112, *construing Restatement (Second) of Torts § 229A (1965).*

We agree that comment e imposes a professional standard of care on the supplier of information in drawing inferences from facts not known to the recipient. So does comment f to section 552, which states, "He [the supplier of information] must exercise the competence reasonably expected of one in his business or professional position in drawing inferences from facts not stated in the information." Where, as in *Powder Horn Nursery,* the alleged lack of care occurred during the professional or business activity, the plaintiff must present expert witness testimony as to the care and competence prevalent in the business or profession. The lack of care alleged by the plaintiff in the instant case, however, is not that United Chambers drew unreasonable inferences. Rather, St. Joseph's alleges that United Chambers showed a lack of reasonable care in inviting hospitals to verify coverage without having first investigated the accuracy of the insured's representations on the applicaton.

Comment f addresses the duty of care in this context:

> The care and competence that the supplier of information for the guidance of others is required under the rule stated in this Section to exercise in order that the information given may be correct, must be exercised in the following particulars. *If the matter is one that requires investigation, the supplier of the information must exercise reasonable care and competence to ascertain the facts on which his statement is based.* He must exercise the competence reasonably expected of one in his business or professional position in drawing inferences from facts not stated in the information.

(Emphasis added).

This reasoning was followed in *Arizona Title v. O'Malley Lumber Co.,* 14 Ariz. App. 486, 484 P.2d 639 (1971), where the title company, the agent disbursing construction loan proceeds, made representations to the contractors that sufficient funds would be available to pay them for labor and material subsequently performed and supplied on a construction project. The contractors' bills exceeded the loan proceeds in escrow with the title company. The court of appeals agreed that the title company "owed no contractual or trust duty to the contractors" but once the title company "chose to speak, ... under all of the circumstances its business relationship with the contractors carried with it a duty to exercise reasonable care in making representations about presently ascertainable facts." *Id.* at 492, 484 P.2d at 643. *Accord Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275, 276 (1922) ("[O]ne who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all."). We agree with the court of appeals' emphasis that "Arizona Title's duty was to exercise reasonable care not to misstate existing, ascertainable facts." 14 Ariz.App. at 493, 484 P.2d at 644.

 Montney's representations as to height, weight, and doctors consulted (the basis of United Chambers' recission) were existing facts, ascertainable by reasonable investigation. We hold that a supplier of commercial information must exercise reasonable care and competence in ascertaining accuracy of the facts upon which the information is based. Expert witness testimony is not necessary to establish the reasonableness of the investigation conducted by the supplier of information. In this case, whether United Chambers exercised reasonable care and competence in ascer-

**316**

taining the facts on which its verification of coverage were based was appropriately resolved by the jury.

■ Having established sufficient evidence of United Chambers' duty to exercise reasonable care in making representations, we must determine whether St. Joseph's reliance on United Chambers' insurance coverage verification was reasonable. To determine whether one party to a transaction was justified to rely on the other party's representations depends on the complaining party's own information and intelligence. *See Lockard v. Carson,* 287 N.W.2d 871, 878 (Iowa 1980). "In the absence of circumstances putting a reasonable person on inquiry, a person is justified in relying on a misrepresentation of a material fact without making further inquiry." *Citizens Savings & Loan Ass'n. v. Fischer,* 214 N.E.2d 612, 616, 67 Ill. App.2d 315, 324 (1966) (cited in *Zurad v. Lehman Bros. Kuhn Loeb Inc.,* 757 F.2d 129, 135 (7th Cir.1985)).

■ St. Joseph's made repeated calls to verify Montney's insurance coverage; United Chambers never indicated that it was investigating the representations on application, including seeking information from doctors who had treated Montney prior to his application. The postcards sent by United Chambers to St. Joseph's merely indicated that payment of the hospital's bills was pending receipt of the attending physician's statement. United Chambers continued to verify Montney's coverage even after having rescinded his policy. St. Joseph's Patient Accounts Manager testified that, based on his experience, if coverage is questioned by the insurer, the hospital verifying coverage is informed immediately. He also stated that, in over ten years of experience, this was the only case where the hospital received an unconditional verification from the insurer followed by a complete denial of benefits. Therefore, under these circumstances, St. Joseph's reliance was justified.

■ Furthermore, reliance is justifiable where the misrepresentation is material. Reliance exists if substantial weight was given to a representation. *Prosser and*

*Keeton on Torts* § 108 (5th ed. 1984). "The representation does not have to be the sole cause of damage; it is enough if it had a material influence upon the plaintiff's conduct or was a substantial factor in bringing about his or her action." *SEDCO Int'l., S.A. v. Cory,* 683 F.2d 1201, 1206 (8th Cir.), *cert. denied,* 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982). As discussed above, United Chambers' verification of coverage was a crucial consideration of St. Joseph's admission procedure. Whether United Chambers' verification was a material representation and whether St. Joseph's reliance was reasonable was properly resolved by the jury. *See Union Bank v. Safanie,* 5 Ariz.App. 342, 347, 427 P.2d 146, 151 (1967).

### 2. Estoppel

The court of appeals held that there was no evidence to support a claim of promissory estoppel:

St. Joseph's never asked and United Chambers never stated that it would pay the expenses incurred by its insured. A truthful verification of the existence of a policy at the time benefits information is requested is not equal to a promise or representation that payment will be made irrespective of coverage and liability of the insurance company to its insured.

\* \* \* \* \* \*

Testimony from St. Joseph's employees who had received the policy benefits information confirmed that they understood the verification of benefits was not a guarantee of payment. This is insufficient to establish justifiable reliance....

154 Ariz. at 306, 742 P.2d at 807.

United Chambers contends that St. Joseph's failed to prove its cause of action for promissory estoppel, as pled and as argued in plaintiff's motion for summary judgment. St. Joseph's agrees that it pled promissory estoppel but asserts that it successfully presented a case for estoppel. The jury was instructed on estoppel:

If the defendants made express or implied representations which caused the

hospital to treat Montney, and the hospital justifiably relied on any representation made by the defendants, to the detriment of the hospital, and if enforcement of the defendants' representations is necessary in the interests of justice, then your verdict should be for the plaintiff. If any of these elements is missing, your verdict should be for the defendants.

Furthermore, the jury's verdict, as read and recorded, was "For the Plaintiff and against the Defendants on the claim of estoppel." The defendants' timely objections to the "Form of Judgment" did not address the estoppel action. The trial court denied the defendants' request that the word "promissory" be inserted in the judgment on the grounds that the objection was untimely filed.

■■■ We believe that St. Joseph's presented sufficient evidence to support a judgment for estoppel. Estoppel in pais includes all forms of estoppel not arising from a record, from a deed, or from a written contract; estoppel in pais, equitable estoppel and estoppel by misrepresentation are interchangeable names for the same action. *G & S Invest. v. Belman*, 145 Ariz. 258, 263, 700 P.2d 1358, 1363 (App.1984); CORPUS JURIS SECUNDUM Estoppel § 59. A claim for estoppel arises when one by his acts, representations or admissions intentionally or through culpable negligence induces another to believe and have confidence in certain material facts and the other justifiably relies and acts on such belief causing him injury or prejudice. *Heltzel v. Mecham Pontiac*, 152 Ariz. 58, 730 P.2d 235 (1986); *Graham v. Asbury*, 112 Ariz. 184, 186, 540 P.2d 656, 658 (1975); CORPUS JURIS SECUNDUM Estoppel § 59.

■■■ The representations do not necessarily have to be made with the intent to deceive, defraud or mislead another. *Waugh v. Lennard*, 69 Ariz. 214, 228, 211 P.2d 806, 818 (1949); *G & S Invest. v. Belman*, 145 Ariz. at 263, 700 P.2d at 1363. To prevent injustice, equitable estoppel holds as true a representation acted on, when the person who made it, or his privies, deny its truth, and attempt to deprive

the party who has acted on the benefit obtained. *See Graham v. Asbury*, 112 Ariz. at 186, 540 P.2d at 658; *Munger v. Boardman*, 53 Ariz. 271, 278, 88 P.2d 536, 542 (1939); *Young Mines Co. v. Citizens' State Bank*, 37 Ariz. 521, 528, 296 P. 247, 254 (1931).

■■■ We previously have discussed United Chambers' negligent failure, after having invited hospitals to verify their insureds' coverage, to ascertain the factual basis of their representations of Montney's insurance coverage. St. Joseph's had no knowledge of the misrepresentations on Montney's insurance application; nor did St. Joseph's have any duty to ascertain United Chambers' procedure for issuing insurance coverage to its applicants. St. Joseph's believed United Chambers' verification of Montney's insurance coverage and acted accordingly and reasonably.

■■■ United Chambers has raised the argument that estoppel cannot prevail against the public policy enunciated by the legislature in A.R.S. § 20–1109. *See Red Rover Copper Co. v. Industrial Comm'n*, 58 Ariz. 203, 118 P.2d 1102 (1941). Section 20–1109 provides that misrepresentations in an application for insurance will not bar recovery under an insurance policy unless the misrepresentations are fraudulent, material to the risk accepted or hazard assumed, and the insurer, in good faith, would not have issued the policy if the true facts had been known. *See Smith v. Republic Nat'l Life Ins. Co.*, 107 Ariz. 112, 483 P.2d 527 (1971). United Chambers argues that to estop them from rescinding a policy obtained by misrepresentation would contravene the statute.

While United Chambers' may have asserted this argument successfully against its insured, we do not consider it applicable to St. Joseph's claim of estoppel. Indeed, estopping United Chambers from denying insurance coverage for Montney's hospital bills after St. Joseph's had called United Chambers to verify such coverage is consistent with policy of having those commercial entities which profit from a transaction bear the risk of the transaction.

That portion of the court of appeals' opinion concerning negligent misrepresentation and estoppel is vacated and the trial court judgments on these issues are affirmed. The court of appeals' reversal of the bad faith judgment is approved.

The matter is remanded to the trial court with instructions to proceed in conformity with this opinion.

GORDON, C.J., FELDMAN, V.C.J., and HOLOHAN, J., concur.

NOTE: Justice MOELLER did not participate in the determination of this matter.