991 P.2d 246

Tammy J. LABOMBARD,
Defendant–Appellant,

v.

SAMARITAN HEALTH SYSTEM (dba
Good Samaritan Regional Medical Cen-
ter, Maryvale Samaritan Medical Cen-
ter, and Thunderbird Samaritan Medical
Center and Samaritan Air Evac), Defen-
dant–Appellee.

No. 1 CA–CV 97–0473.

Court of Appeals of Arizona,
Division 1, Department A.

Aug. 6, 1998.

Review Denied Jan. 4, 2000.

Gulinson Law Offices by Gene G. Gulinson, Phoenix, for Defendant–Appellant.

Gammage & Burnham, P.L.C. by Richard B. Burnham and Cameron C. Artigue, Phoenix, for Defendant–Appellee.

OPINION

THOMPSON, Judge.

¶ 1 This appeal arises from an interpleader action filed by State Farm Mutual Automobile Insurance Company (State Farm) to determine who is entitled to receive $20,674.78 in interpleaded funds. We hold that Tammy LaBombard has failed to show detrimental reliance and therefore Samaritan Health System (Samaritan) is not estopped to assert its medical lien. Because Samaritan holds a medical lien it is entitled to collect all of its "customary charges" from the proceeds of Tammy LaBombard's settlement with State Farm's insured. However, Samaritan must pay a proportionate share of the attorneys' fees incurred in obtaining the settlement. Additionally, we remand to the

trial court to determine whether Samaritan's "billed charges"—i.e., the charges based on the schedule of rates and charges filed with the Department of Health Services—are the same as its "customary charges."

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 Because the trial court ruled on cross-motions for summary judgment, the facts generally (though not without exception) are undisputed. Nevertheless, to the extent that the parties disagree or that we are required to draw inferences from the undisputed facts, we view the evidence in the light most favorable to the party against whom the summary judgment was entered, in this case LaBombard. *See Pioneer Annuity Life Ins. Co. v. Rich*, 179 Ariz. 462, 464, 880 P.2d 682, 684 (App.1994).

¶ 3 On August 23, 1991, LaBombard was riding in a Jeep driven by Shane Rogers. Rogers lost control of the Jeep, the Jeep ran off the road and overturned, and LaBombard was ejected from the Jeep and injured.

¶ 4 Maricopa County paid some of the initial costs of emergency treatment for La-Bombard. LaBombard later was admitted and treated for her injuries at the Samaritan medical facilities, as a patient under the Arizona Health Care Cost Containment System (AHCCCS). AHCCCS pays care providers a percentage of billed charges, based on a statutory formula.[1] The amount paid is generally, but not always, substantially less than Samaritan's billed charges. In this case, Samaritan's total billed charges were approximately $30,000, and AHCCCS paid Samaritan approximately $9500.

¶ 5 AHCCCS, Maricopa County, and Samaritan all filed liens against any judgment or settlement LaBombard might receive in connection with any claim for damages for the injuries necessitating the medical treatment, pursuant to Arizona's lien statutes. Ariz.Rev.Stat.Ann. (A.R.S.) 33–931 (health care provider lien statute) and 36–2915 (AHCCCS lien statute). Samaritan perfected liens totaling $20,674.78. AHCCCS perfected liens in the amount of $26,000.00, reflecting amounts paid to Samaritan and others.

¶ 6 LaBombard pursued a personal injury claim against Rogers. LaBombard and Samaritan stipulated in this interpleader action that LaBombard's claim for damages arising out of the Jeep accident was worth $500,000.00. Rogers's State Farm insurance policy, however, provided coverage in the amount of only $50,000.00. In an attempt to ensure that LaBombard would actually receive any sums recovered from Rogers and/or his insurer, LaBombard's attorney worked out compromises with AHCCCS to reduce the amount of its lien before settling LaBombard's claim against Rogers. AHCCCS reduced its lien to $4,000.00. In December 1994, a person from LaBombard's attorney's office contacted Samaritan, and Samaritan stated that there was no balance due on LaBombard's account.

¶ 7 LaBombard settled her claim against Rogers for his insurance policy limit of $0,000.00, plus a parcel of property in Prescott Valley and the Jeep. State Farm paid $4,000.00 to AHCCCS, $200.00 to Maricopa County, $11,390.80 in fees plus $1,864.77 in costs to LaBombard's attorneys, and $11,390.81 to LaBombard. Because Samaritan asserted that its perfected liens entitled it to recover the remaining $20,674.78 as payment for its uncollected billed charges for services rendered to LaBombard, while Labombard asserted that she was entitled to receive those funds, State Farm filed this interplead-

1. AHCCCS generally does not pay hospitals directly for medical care. Rather, as explained in *Arizona Health Care Cost Containment Sys. v. Bentley*, 187 Ariz. 229, 231 n. 1, 928 P.2d 653, 655 n.1 (App.1996),

AHCCCS will enroll a person who is eligible for AHCCCS benefits in one of the health plans or health care service organizations with which it contracts to provide care. The health plan or health care service is then responsible

for either providing the health care or for subcontracting with other health care providers. A.R.S. § 36–2904 (1993). AHCCCS remains the payor of last resort in situations in which the individual is determined to be AHCCCS eligible but has not yet been enrolled in a health plan. A.R.S. § 36–2903(G) (1993). In this case, LaBombard was enrolled in a health plan, which paid for her care.

er action in February 1995 to determine the payee for the $20,674.78.

¶ 8 Samaritan and LaBombard filed cross-motions for summary judgment, each alleging their entitlement to the proceeds as a matter of law. LaBombard alleged that (1) Samaritan had waived or was estopped to assert its lien by stating that no balance was due on her medical bills; (2) Samaritan's "billed charges" are not its "customary charges" and therefore Samaritan was not entitled to recover the full amount of its billed charges under the medical lien statute; and (3) if Samaritan's lien is enforceable, Samaritan's recovery should be equitably apportioned. Samaritan argued that the lien statute provides that health care providers are entitled to be paid their "customary charges" in full from the patient's recovery from third parties, and that "customary charges" means "billed charges."

¶ 9 In May 1997, the trial court entered judgment in favor of Samaritan. LaBombard moved for a new trial, arguing that Samaritan's recovery should be equitably apportioned. The trial court denied LaBombard's motion for a new trial, and LaBombard timely appealed. This court has jurisdiction pursuant to A.R.S. 12–2101(B).

## DISCUSSION

¶ 10 On appeal from a motion for summary judgment, we review the trial court's application of the law *de novo. Pioneer,* 179 Ariz. at 464, 880 P.2d at 684. We begin with the language of the relevant lien statute, A.R.S. 33–931:

A. Every individual, partnership, firm, association, corporation or institution or any governmental unit maintaining and operating or providing health care services in this state, which has been duly licensed by this state or any political subdivision or private entity with ambulances operated, licensed, or registered pursuant to title 36, chapter 21.1, is entitled to a lien for the customary charges for care and treatment or transportation of an injured person, upon any and all claims of liability or indemnity except health insurance for damages accruing to the person to whom the services are rendered, or to the legal rep-

resentative of such person, on account of injuries giving rise to such claims and which necessitated such services.

B. The lien entitlements authorized by subsection A are applicable to all customary charges by hospitals or ambulances of political subdivisions, but restricted to customary charges in excess of two hundred fifty dollars by all other providers and privately owned ambulance companies excluding interest and service charges. Liens perfected pursuant to this article by a hospital have priority for payment over all other liens authorized by this article.

A.R.S. 33–931 (1990) (footnote omitted). A hospital may perfect its lien pursuant to this statute by recording a verified statement with the office of the county recorder in the county where the injuries were incurred, within thirty days after the patient is discharged from the hospital. A.R.S. 33–932 (1990). The verified statement must provide certain specific information, and the hospital must send a copy of the lien by certified mail to the injured person. *Id.*

¶ 11 The parties do not dispute that Samaritan recorded hospital liens pursuant to these statutes totaling $20,674.78 and mailed copies to LaBombard. LaBombard, however, argues that Samaritan's liens are unenforceable because (1) Samaritan confirmed a "zero balance" due on LaBombard's account and therefore is estopped from enforcing its liens; (2) Samaritan is precluded from enforcing its lien for the entire lien amount under the doctrine of equitable apportionment; (3) Samaritan should at least be required to pay its fair share of the attorneys' fees under the "common fund" doctrine; and (4) Samaritan's "customary charges" are not the same as its "billed charges," and Samaritan did not provide evidence of its "customary charges for care and treatment," to support its claim to over $20,000.00 for hospital services rendered.

### A. Estoppel

¶ 12 "A claim for estoppel arises when one by his acts, representations or admissions intentionally or through culpable negligence induces another to believe and

have confidence in certain material facts and the other justifiably relies and acts on such belief causing him injury or prejudice." *St. Joseph's Hosp. and Med. Ctr. v. Reserve Life Ins. Co.*, 154 Ariz. 307, 317, 742 P.2d 808, 818 (1987) (citations omitted). "Detrimental reliance is an essential ingredient of estoppel, without which there can be no estoppel." *In re Musgrove*, 144 Ariz. 168, 172, 696 P.2d 720, 724 (App.1985). Thus, to prevail on her estoppel claim, LaBombard must show that she suffered injury or prejudice because she took some action in reliance on Samaritan's statement that she owed no balance.

¶ 13  LaBombard asserts that Samaritan's statement that she owed no balance "cleared the way for a settlement" with Rogers, since AHCCCS and Maricopa County already had agreed to equitably apportion their claims. Thus, she argues, Samaritan should be estopped from now asserting a balance due.

¶ 14  LaBombard, however, has not alleged any legally cognizable injury or prejudice that resulted from any action she took in reliance on this belief, nor have we found any, even viewing the facts in the light most favorable to LaBombard. She admits that she settled the claim for the limits of the insurance policy; she thus did not settle for less than the policy limits in reliance on an understanding that she would not have to pay Samaritan any of the funds recovered. Nor does she allege that she somehow would have been able to recover funds in excess of the policy limit if she had known that she must pay Samaritan's lien claims. She does not allege that she would have abandoned her attempts to recover the funds if she had known that she must pay Samaritan, or even that she incurred additional expenses in the settlement (which occurred approximately two months after Samaritan stated there was a "zero balance") that she would not otherwise have incurred.[2]  The only "injury" LaBombard arguably alleges is that she does not get to keep the funds after she was led to believe that she would be able to do so. This is insufficient to support an estoppel claim. In short, because LaBombard has not shown

detrimental reliance on Samaritan's statement, her estoppel claim must fail.

B.  Equitable Remedies

1.  Apportionment

¶ 15  LaBombard asserts that the trial court erred in allowing Samaritan to collect its entire claim. She asserts that it is inequitable to allow Samaritan to recover 100% of its claim while she, the injured party, recovers only about 2% of the stipulated value of her claim ($11,390.81 of a $500,000.00 claim). In support of this argument, LaBombard cites only one case, *Cockerham v. Garvin*, 768 F.2d 784 (6th Cir.1985). In *Cockerham*, the Sixth Circuit held that "[i]f an injured veteran has accepted a discounted settlement for his claims of wage loss, pain and suffering, loss of future earning potential, and the like, it is not equitable to require full reimbursement for services the government was duty-bound to render." *Id.* at 787.

¶ 16  The court in *Cockerham*, however, was interpreting a claim under the federal Medical Care Recovery Act, 42 U.S.C. 2651, which provides that the United States government is subrogated to any claim of an injured veteran if the government furnishes medical care for the veteran. *Id.* at 786. As the court noted, "[s]ubrogation is a broad equitable remedy long used by courts to balance the interests of adverse parties and prevent unjust enrichment." *Id.* (citations omitted). Applying the principles of equitable apportionment therefore makes sense in the context of a subrogation right, which is based in equity.

¶ 17  By contrast, lien rights are statutory, and " 'where rights are clearly established and defined by statute, equity has no power to change or upset such rights.' " *Appeal in Juvenile Action No. JV–128676*, 177 Ariz. 352, 356, 868 P.2d 365, 367 (App.1994) (quoting *Ayer v. General Dynamics Corp.*, 128 Ariz. 324, 326, 625 P.2d 913, 915 (App. 1980)). Thus, if the health care provider lien statute clearly establishes Samaritan's right to collect all of its "customary charges," Sa-

---

**2.**  We express no opinion regarding whether any of these hypothetical injuries would be sufficient to constitute detrimental reliance, if alleged. We

list them only to illustrate that LaBombard was not alleged any sort of injury or prejudice at all.

**548**

maritan's claim cannot be reduced to allow LaBombard to collect the same proportion of her claim as Samaritan collected of its claim. We thus turn to interpretation of the lien statute.

¶ 18 "Statutes must be given a sensible construction that accomplishes the legislative intent and which avoids absurd results." *Arizona Health Care Cost Containment Sys. v. Bentley*, 187 Ariz. 229, 233, 928 P.2d 653, 657 (App.1996) (citing *Collins v. State*, 166 Ariz. 409, 415, 803 P.2d 130, 136 (App.1990)). "The underlying goal of a hospital lien statute is to lessen the burden on hospitals and other medical providers imposed by non-paying accident cases." *In re Guardianship of Bloomquist*, 246 Neb. 711, 523 N.W.2d 352, 356 (1994) (citing Annot., 16 A.L.R.5th 262 2[a] (1993)).

¶ 19 Arizona's medical lien statute provides that a hospital is entitled to a lien on the injured person's liability or indemnity claims against third parties for "the customary charges for care ad treatment or transportation of [the] injured person," and that the liens apply to "all customary charges by hospitals or ambulances of political subdivisions, but [are] restricted to customary charges in excess of two hundred fifty dollars by all other providers...." A.R.S. 33–931(A) and (B) (1990). The most reasonable interpretation of the statute is that the use of the phrase "all customary charges" in subsection (B) indicates that even non-public hospitals are entitled to assert a lien for "*all* customary charges ... in excess of two hundred fifty dollars." A.R.S. 33–931(B) (emphasis added). Additionally, the statute limits the lien to "customary charges in excess of two hundred fifty dollars" by non-public hospitals, but does not otherwise impose any limits on the hospitals' recovery. The statute does not, for example, limit the lien to "an equitable portion of the customary charges," nor does it provide for a reduction of the

customary charges if it would be "unfair" to the patient to enforce the lien.[3] Thus, the language of the statute indicates that Samaritan may recover "all" of its customary charges (in excess of$250), without reducing them by way of equitable apportionment.

¶ 20 Moreover, this interpretation is in line with the statute's purpose to reduce the burden on hospitals of non-paying patients. Certainly, many AHCCCS participants or other non-paying patients have limited resources, and the legislature could perhaps have required hospitals to treat them for free or at a discounted rate, or to accept payment only from AHCCCS. Instead, the legislature has determined that hospitals should be entitled to collect the balance of their "customary charges" for services they provide even to low-income patients (and, similarly, allows AHCCCS to require reimbursement of amounts AHCCCS has paid), if those patients later recover funds from a third-party payor or tortfeasor in compensation for injuries for which the hospital provided treatment. We will not second-guess the legislature's decision.

### 2. Common Fund Doctrine

¶ 21 LaBombard alternatively asserts that, if Samaritan's entire claim is not equitably apportioned, Samaritan should at least be required to pay a proportionate share of the attorneys' fees incurred in obtaining the settlement, pursuant to the "common fund" doctrine.

¶ 22 The common fund doctrine is a general rule of equity that "a person or persons who employ attorneys for the preservation of a common fund may be entitled to have their attorney's fees paid out of that fund." *In re Estate of Brown*, 137 Ariz. 309, 312, 670 P.2d 414, 417 (App.1983) (citation omitted). It is "a recognized exception to

3. Additionally, although we sympathize with La-Bombard's predicament, having been injured by a person who apparently did not maintain adequate insurance to fully cover her injuries, we question LaBombard's premise that it is somehow unfair to require her to pay for medical services she received and which she has become able to pay. If State Farm had paid LaBombard the $50,000.00 before she entered the hospital, there is little doubt that she would have been required to pay her own hospital bills to begin with, rather than having any portion paid by AHCCCS. Moreover, because AHCCCS has compromised its lien, LaBombard essentially has received discounted medical care, and is being asked to pay only a portion of the total fees incurred.

the rule that attorney's fees in Arizona are allowed pursuant only to statute or contract." *Id.* (citation omitted). The reason for the common fund doctrine is to ensure

> fairness to the successful litigant, who might otherwise receive no benefit because his recovery might be consumed by the expenses; correlative prevention of an unfair advantage to the others who are entitled to share in the fund and who should bear their share of the burden of its recovery; encouragement of the attorney for the successful litigant, who will be more willing to undertake and diligently prosecute proper litigation for the protection or recovery of the fund if he is assured that he will be promptly and directly compensated should his efforts be successful.

*Id.* at 313, 670 P.2d at 418 (quoting *Estate of Stauffer*, 53 Cal.2d 124, 346 P.2d 748, 752 (1959)). As with the equitable theory of apportionment, however, the common fund doctrine is a rule of equity, so if the statute clearly provides that the hospital is not required to pay a proportionate share of attorneys' fees, we will not apply the equitable doctrine to circumvent the statute.

■ ¶ 23  Samaritan asserts that the statute is clear, and that because it does not provide that hospitals must pay a share of attorneys' fees, fees are not recoverable. Samaritan notes that the lien statute gives a hospital a lien on "any and all claims of liability ... for damages" related to an injury treated by the hospital, without mentioning payment of costs and fees incurred in collecting on such claims. *See* A.R.S. 33–931(A) (emphasis added). Additionally, Sa-

maritan points to language in the AHCCCS statutory scheme which provides that "[a] hospital may collect *any unpaid portion of its bill* from other third party payors or in situations covered by [A.R.S. 33–931]." A.R.S. 36–2903.01(J)(5) (Supp.1997) (emphasis added). It is true that neither statute specifically provides that a hospital must pay a share of the attorneys' fees incurred in pursuing the claims against third-party payors; nevertheless, the common fund doctrine is, itself, an exception to the rule that attorneys' fees are not recoverable unless a statute provides for their recovery. Thus, we will consider whether the doctrine should apply in the circumstances of this case.

■ ¶ 24  LaBombard urges this court to follow the New Mexico and Nebraska Supreme Courts in holding that the common fund doctrine applies to funds subject to a hospital lien, citing *Martinez v. St. Joseph Healthcare Sys.*, 117 N.M. 357, 871 P.2d 1363, 1366–67 (1994), and *Bloomquist*, 523 N.W.2d at 360. The New Mexico and Nebraska medical lien statutes are similar, though not identical, to Arizona's lien statute.[4]

¶ 25  In *Martinez*, the court explained that

> [i]n hospital lien cases, the hospital's right to assert a lien, and its right to recovery based on that lien, depend *by statute* on the obtaining of a judgment or settlement. The proceeds of that judgment or settlement operate as a fund, and, without the fund, the hospital has nothing upon which to assert a lien under the Act. By seeking

---

**4.** The New Mexico medical lien statute provides in relevant part as follows:

> A. Every hospital located within the state that furnishes emergency, medical, or other service to any patient injured by reason of an accident ... is entitled to assert a lien upon that part of the judgment, settlement or compromise going, or belonging to such patient, less the amount paid for attorneys' fees, court costs and other expenses necessary thereto in obtaining the judgment, settlement or compromise, based upon injuries suffered by the patient or a claim maintained by the heirs or personal representatives of the injured party in the case of the patient's death.
> B. A hospital lien may be filed upon damages recovered ... for the amount of the reason-

able, usual and necessary hospital charges for treatment, care and maintenance of the injured party. . . .

N.M. Stat. Ann. § 48–8–1 (1978 & Supp. 1987).

The Nebraska medical lien statute provides in relevant part as follows:

> Whenever any person employs a ... hospital to perform professional service ... in the treatment of or in connection with an injury, and such injured person claims damages from the party causing the injury, such ... hospital ... shall have a lien upon any sum awarded the injured person in judgment or obtained by settlement or compromise on the amount due for the usual and customary charges of such ... hospital. . . .

Neb. Rev. Stat. § 52–401 (1996).

payment from the fund in reliance on the lien,the hospital directly receives the benefits of the work done by the patient's attorney.... Because of this, it would be fundamentally unfair to allow the Hospital to collect on its lien without paying its prorated share of the legal expenses.

....

We do not agree that the benefit the hospital receives from the judgment or settlement is merely incidental. If the attorney for the patient does not secure a judgment or settlement, the hospital has nothing to which it may attach its lien. At that point, the hospital/patient relationship truly is nothing more than a creditor/debtor relationship, and the hospital must use its own legal resources to recover its funds. In contrast, if the patient's attorney secures a judgment or settlement ... the hospital recovers money due without expending its legal resources. If we did not allow division of the legal costs, hospitals would be encouraged to sit back and reap the rewards of another's labor at that party's expense. We do not believe that is consistent with public policy in New Mexico.

*Martinez*, 871 P.2d at 1366–67 (citation omitted).

¶ 26 Similarly, in *Bloomquist*, the court noted that:

The lien statute grants hospitals a method of obtaining a full or partial recovery for the value of services that the hospitals would probably have "written off" as uncollectible; and while not a windfall to the hospitals,the recovery should not come without costs. In some circumstances, the injured party may lack any incentive to pursue litigation because his medical expenses equal or exceed the limits of insurance or other assets available to satisfy a judgment from a third party. Any recovery such a party would receive would be exhausted by attorney fees and medical expenses.

... If the injured person elects not to prosecute a claim, then the lien itself is worthless. The hospital may not stand in the patient's shoes, but the hospital is entirely dependent upon the patient's attorney.

*Bloomquist*, 523 N.W.2d at 360.

¶ 27 These cases are in the minority. Most courts that have addressed the issue have held that a hospital is entitled to a lien on all funds recovered from third-party payors, without liability for part or all of the attorneys' fees and costs incurred in obtaining the funds. *See, e.g., Trevino v. HHL Fin. Servs., Inc.*, 945 P.2d 1345, 1349 (Colo. 1997); *City and County of San Francisco v. Sweet*, 12 Cal.4th 105, 48 Cal.Rptr.2d 42, 906 P.2d 1196, 1203–04 (1995); *Harlow v. Lloyd,* 15 Kan.App.2d 497, 809 P.2d 1228, 1230–33 (1991); *Illini Hosp. v. Bates*, 135 Ill.App.3d 732, 90 Ill.Dec. 528, 482 N.E.2d 235, 238 (1985); *Mitchell v. Huntsville Hosp.*, 598 So.2d 1358, 1362 (Ala.1992); *Nicholes v. St. Helena Parish Police Jury*, 604 So.2d 1023, 1034 (La.Ct.App.1992).

¶ 28 For example, in *Trevino*, the Colorado Supreme Court addressed whether a hospital was obliged to pay a portion of the attorneys' fees incurred where an uninsured patient (who also was not a participant in Medicare or other public assistance programs) had signed an "Admission Agreement" agreeing to pay all costs for his care and all costs of collection efforts. 945 P.2d at 1345–46. The court explained as follows:

[T]he common fund doctrine is grounded in fiduciary law. Hence, when a plaintiff takes legal action to create or preserve assets of a trust for the benefit of all beneficiaries to the trust, those beneficiaries must pay a proportionate share of the costs incurred in achieving the benefit. Implicit in the doctrine are two requirements: (1) that all beneficiaries are similarly situated; and (2) that but for the plaintiff's actions,the beneficiaries would have been forced to institute the litigation themselves in order to achieve any benefit.

*Trevino*, 945 P.2d at 1347 (citations omitted). Thus, the court explained, in the context of litigation such as class action lawsuits, trust or pension fund litigation, and subrogated insurance claims, the beneficiaries are similarly situated with respect to the fund and, without the litigation, would recover nothing. *Id.* at 1348.

¶ 29   The court further explained that in the medical lien situation, the hospital is a creditor, "with only its statutory right to a hospital lien connecting it to the personal injury fund.... Unlike a subrogated insurer, the defendants did not have any rights against the tortfeasor, nor could they have joined in a lawsuit." *Id.* (footnotes and citations omitted).   Moreover,

> Trevino was certainly not acting for the benefit of the defendants.   He pursued his claim against the [tortfeasor] for his own benefit and the creation of the settlement fund inured primarily to his benefit by enabling him to pay his debt.   The benefit to the defendants was an incidental, not an intended, outcome of the litigation.

*Id.* at 1349.   The court noted that the "critical distinction" was "between parties, including subrogees, who have a contingent interest in litigation on the one hand, and creditors holding a valid hospital lien on the other." *Id.* at 1350.

¶ 30   In sum, the majority rule holds that, while parties who depend on the outcome of the litigation to recover their share of the funds are required to share in the costs of the litigation, hospital lien creditors are entitled to payment regardless of the outcome of the litigation and therefore are not required to share in the litigation costs.

¶ 31   The cases stating the majority rule, however, do not involve a situation such as in this case, in which the patient was initially admitted under an AHCCCS or Medicare type of program and the hospital is prohibited from pursuing the patient directly to obtain payment.   Rather, those cases involve patients who were admitted to the hospital without insurance and agreed to pay the charges incurred.   Thus, the patients were obligated to repay the hospitals whether they obtained funds from a third party.   By contrast, Samaritan admits that it has no right to recover directly against LaBombard under the AHCCCS regulations.   Thus, Samaritan has a valid hospital lien but is not a "creditor" in the usual sense of the word because it has only a contingent interest in litigation.   In other words, Samaritan cannot attempt to collect directly from LaBombard, although it does hold a valid lien on any funds she

recovers *if* she litigates or settles a claim against the person who caused her injuries.

¶ 32   We think this case is appropriate for application of the common fund doctrine. Without the litigation by LaBombard (and the assistance of her attorney), Samaritan would recover nothing.   We agree with the *Martinez* court's observation that

> [b]y seeking payment from the fund in reliance on the lien, the hospital directly receives the benefits of the work done by the patient's attorney....   Because of this, it would be fundamentally unfair to allow the Hospital to collect on its lien without paying its prorated share of the legal expenses.

*Martinez*, 871 P.2d at 1366–67.

¶ 33   Samaritan must share in paying the attorneys' fees and costs incurred in obtaining the settlement.   We remand to the trial court to determine the appropriate amount of fees Samaritan must pay.

## C.   "Customary Charges"

¶ 34   LaBombard asserts that because Samaritan often accepts payment of less than its billed charges from insurance companies, AHCCCS, and others, its "billed charges" are not the same as its "customary charges." Additionally, she asserts that Samaritan provided no evidence to show what its "customary charges" are, and therefore the court erred in granting summary judgment in its favor.

¶ 35   Samaritan argues that, as a matter of law, its billed charges are the same as its "customary charges."   Samaritan points to the extensive regulation of hospital charges as support for this argument, noting that hospitals must file a schedule of rates and charges with the Department of Health Services (DHS), and the director of DHS must review the rates.   *See* A.R.S. 36–436.   Additionally, hospitals must post their rates in a conspicuous place in the reception area of the hospital and in any outpatient treatment centers.   A.R.S.   36–436.01(B)   (Supp.1997). Moreover, hospitals may not increase a rate or charge until the proposed increase has been filed with and reviewed by the director of DHS. A.R.S. 36–436.02(A).   Finally, hospi-

tals must file a copy of proposed reductions in rates or charges with DHS "for informational purposes" before the reduced rate becomes effective. A.R.S. 36–436.02(B). Samaritan argues that, because the lien statute has referred to a hospital's "customary" charges since 1972, "when all hospital bills were paid at the charges filed with DHS," and because the statutory language has not been amended, "customary charges" must still refer to charges at he rates filed with DHS—i.e., the "billed charges." We note that Samaritan cites no authority for this proposition.

¶ 36 The extensive regulation of hospital rates by DHS establishes only a ceiling for charges, not a floor—a hospital may not *increase* its rates without prior DHS review, but nothing prevents a hospital from *decreasing* its rates, so long as a copy of the reduction is given to DHS. Nor does the statute prohibit a hospital from actually charging less than its posted rates in certain cases (just as hotels are required to post their rates in each guest room, but often charge substantially less than the posted rate, depending on the season, the affiliation of the hotel guest, or other factors). Samaritan does not dispute that it may, and does, collect less than its "billed charges" for certain clients from time to time.

■ ¶ 37 Additionally, the legislature could have used the phrase "billed charges" if it wished to ensure that hospitals receive payment at the rates filed with DHS in medical lien cases regardless of whether hospitals ever actually receive payment at those rates from other patients. That it chose to use the word "customary" instead indicates that it intended a different meaning. The word "customary" is defined as "fixed by custom," "commonly practiced, used, or observed," and "expressing habitual action." Webster's Third New International Dictionary (1969). Thus, if Samaritan "commonly" or "habitually" reduces its billed charges, its "customary charges" may indeed be lower than its "billed charges," which are the charges at the rates on file with DHS. Samaritan's argument that the lien statute has referred to "customary" charges since 1972 "when all hospital bills were paid at the charges filed with DHS"

implicitly recognizes that, in 1998, hospital bills are *not* always paid "at the charges filed with the DHS." Customs change; the legislature need not amend the statute for the words "customary charges" to mean, in 1998, something other than the "billed charges" or rates on file with DHS, even if Samaritan is correct that "customary charges" meant the DHS rates in 1972.

¶ 38 LaBombard presented evidence that, indeed, customary charges may be different from "billed charges." For example, Kristine Fiorentine, a lien representative for Samaritan, testified that Samaritan often accepts payment of less than its "billed charges," from health maintenance organizations, private insurers such as Blue Cross, and private patients. Samaritan, however, also provided some evidence that its "customary charges" are the same as its "billed charges," at least in this case. Samaritan presented an affidavit of Rose Ann Frank, an employee in Samaritan's Reimbursement Services Department. Ms. Frank avowed that Samaritan's bills are generated by a computer based on the rates on file with DHS, that these charges are Samaritan's "ordinary, usual and customary charges," and that the charges filed with DHS are billed to all of Samaritan's patients. Nevertheless, she admitted that Samaritan accepts partial reimbursement from certain insurance companies and governmental payors. The question, as we see it, is whether these partial reimbursements are "customary," such that, in actuality, Samaritan customarily charges its patients less than it bills them. If so, the question becomes, what is the "customary" amount of the reduction?

■ ¶ 39 Because the parties presented conflicting evidence on this issue, the trial court erred in granting summary judgment on this issue. We remand to the trial court for findings of fact regarding whether Samaritan's "customary charges" are equal to its "billed charges."

## D. Attorneys' Fees

¶ 40 LaBombard has requested an award of attorneys' fees on appeal. Because she has cited to no authority for her request, we deny it.

## CONCLUSION

¶ 41   For the foregoing reasons, we affirm the trial court's holding that Samaritan is not estopped to assert its medical lien, as well as its holding that LaBombard is not entitled to equitable apportionment of the settlement fund.  We reverse the trial court's holding that Samaritan is not required to share the costs and pay a portion of the attorneys' fees incurred in obtaining the settlement with State Farm, and remand to the trial court to determine the appropriate amount of costs and fees Samaritan must pay.  We also remand to the trial court to determine whether Samaritan's "customary charges" are the same as its "billed charges," and, if not, to determine the amount of Samaritan's "customary charges" for services rendered to LaBombard.  We deny LaBombard's request for attorneys' fees on appeal.

CONCURRING: CECIL B. PATTERSON, JR., *Presiding Judge,* and MICHAEL D. RYAN, *Judge.*