992 P.2d 11

**Jenny GUO, Plaintiff–Appellant,**

v.

**MARICOPA COUNTY MEDICAL CEN-TER, a subdivision or entity of Maricopa County, Defendant–Appellee.**

No. 1 CA–CV 99–0157.

Court of Appeals of Arizona, Division 1, Department C.

Dec. 30, 1999.

Sally Clifford Shanley, Scottsdale, Attorney for Appellant.

Richard Romley, Maricopa County Attorney by Mary C. Cronin, Deputy County Attorney, Phoenix, Attorneys for Appellee.

## OPINION

EHRLICH, Judge.

¶1 Maricopa County Medical Center ("MCMC") terminated the employment of Jenny Guo in the MCMC residency program in anesthesiology because of Dr. Guo's overall poor performance and her failure to pass the professional examinations required of her. Dr. Guo then sued MCMC for alleged breach of contract and violations of the Americans With Disabilities Act and the Family and Medical Leave Act. The trial court granted summary judgment in favor of MCMC, ruling that the evidence indisputably showed that MCMC was entitled to terminate the contract, that Dr. Guo was unable to meet her burden of proving that she was qualified to perform the functions of the job with or without accommodation, and that MCMC did not violate her rights under the Family and Medical Leave Act. For the following reasons, we affirm this decision.

### FACTUAL AND PROCEDURAL HISTORY

¶2 On July 1, 1992, Dr. Guo began a three-year residency program in the MCMC anesthesiology department. The terms and conditions of her residency were set forth in the MCMC residency contract and its appendices, the residency manual, the house staff manual and the requirements of the American Board of Anesthesiology ("ABA"). These terms included a provision that, upon entry into the anesthesiology residency program and each year thereafter, the resident would take the ABA "in-training" examination as practice for the national examination to become board-certified in anesthesiology. Additionally, the resident had to take the three-part United States Medical Licensing Examination ("USMLE") in order to obtain a medical license or at least be license-eligible by the end of the residency program.

¶3 Throughout the anesthesiology residency program, each resident received faculty evaluations on a daily basis and written evaluations on a quarterly basis. The evaluations were reviewed by the residency Competency Committee, and a summary of the evaluations was presented to the resident. A resident who received an unsatisfactory evaluation regarding academic or clinical performance could take part in tutorial programs and be placed on program review to identify specific weaknesses.

¶4 Approximately three months after Dr. Guo began her residency, MCMC placed her on program review because of her poor performance on the first in-training examination and difficulties she had meeting her responsibilities as a resident. In a letter to Dr. Guo dated September 27, 1992, Jerry Calkins, chairman of the Department of Anesthesiology and director of the residency program, advised her of her unauthorized absences from the clinical area, poor concentration during the delivery of anesthesia and lack of concern for clinical care. Moreover, in her first-year evaluations, she was described as an "unacceptable resident." Consequently, MCMC instructed Dr. Guo to seek assistance from her advisor and other faculty members in the program in order to overcome these shortcomings. She was also given a leave of absence from October 5 to 31, 1992, to reflect on her commitment to become an anesthesiologist.

¶5 Dr. Guo improved somewhat on the in-training examinations in July 1993 and 1994; however, her scores were still below the 25th percentile and below the scores of her peers. She failed the third part of the USMLE in the summer of 1994. As a result, MCMC asked Dr. Guo to participate in tutoring sessions and board-refresher review programs, as well as to discuss assigned readings with a faculty member every other week.

¶6 Despite these measures, Dr. Guo's unsatisfactory performance continued. In early November 1994, she was sent home from a cardiac anesthesia clinical rotation at another medical facility because "her knowledge base was so shallow that it [was] not in anyone's best interest for her to continue on her cardiac anesthesia clinical rotation." Shortly after the rotation ended, Dr. Calkins told Dr. Guo that he was "not optimistic with

her being able to overcome her base knowledge deficiency," and he reported her poor evaluation for the past six months to the ABA.

¶ 7 By November 23, 1994, MCMC had set Dr. Guo's review status as program probation. To be removed from probation, as Dr. Calkins explained to Dr. Guo, she had to exhibit significant improvement in her academic knowledge base, and she had to take and pass written and oral examinations within the next several months.

¶ 8 During her third year of residency, Dr. Guo's evaluations continued to document her poor knowledge base and inconsistent performance. In March 1995, she began treatment for depression with Steven Dingle, the MCMC staff psychiatrist. Because of this treatment and Dr. Guo's continuing academic difficulties, Dr. Calkins extended her residency until June 30, 1996, so that she could try and make up her deficiencies. During this time, Dr. Guo also began another rotation at a third facility after which she received an inferior performance review, citing her tendency to be distracted and marginal clinical judgment.[1]

¶ 9 On May 16, 1995, Dr. Calkins authorized for Dr. Guo a second medical leave of absence with pay from May 18 to July 10, 1995, to allow her to prepare for upcoming examinations and to deal with her depression. When Dr. Guo then was given an oral examination, the four examiners were unanimous in their opinions that she had failed.

¶ 10 Dr. Guo was aware that, to remain in the program, she had to pass the in-training examination and USMLE. Although she took the examinations while on leave, she again failed the licensing examination and again scored below the 25th percentile on the in-training examination.

¶ 11 Dr. Guo returned from leave on July 10, 1995, but her situation continued to deteriorate. For example, although Dr. Guo completed a rotation in the Surgical Intensive Care Unit, after two unsatisfactory incidents, Terry Simpson, the chief surgeon, asked that she no longer be involved in the care of his patients. In one instance, he accused her of "gross malfeasance and malpractice." Moreover, in October 1995, Dr. Guo was hospitalized for an overdose of drugs. In light of Dr. Guo's ongoing problems, MCMC decided to place her on continued medical-disability leave.

¶ 12 On October 13, 1995, Dr. Calkins authorized for Dr. Guo a medical leave of absence of five weeks with pay. Her contract would then end because she had not demonstrated improvements in her knowledge and clinical base, not met her responsibilities as a resident, nor passed the in-training examination and part three of the USMLE.

¶ 13 Dr. Guo applied for disability benefits in April 1996. On the application, she stated that she had been unable to work since October 15, 1995, because of her depression. Dr. Dingle indicated on the claim form that her symptoms were "poor concentration, depression, difficulty in learning" based on his treatment of her from March through September 1995. In October 1996, Dr. Guo completed another disability claim form on which she stated that she was still unable to work.[2]

¶ 14 Dr. Guo sued MCMC for breach of contract, discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., among other claims. MCMC moved for summary judgment, argu-

1. Dr. Guo contends that MCMC certified to the Arizona Board of Medical Examiners ("BOMEX") in April 1995 that she was not on probation during her residency. On the same form, the Postgraduate Training Registration, Dr. Guo herself attested that no actions, restrictions or limitations (including probation) had been taken while she was in training, that she had not been counseled regarding her performance or behavior in any training program and that she had not taken a leave of absence during training. How-

ever, by March 31, 1995, when Dr. Guo signed the form, she had been placed on program review and probation and she had been on a leave of absence during her residency. The parties do not adequately explain the discrepancies between the answers on the BOMEX form and the documentary evidence and testimony in the record.

2. Dr. Guo passed the USMLE in December 1996, but she did not seek an anesthesiology position.

ing that it had terminated Dr. Guo's contract because of her substandard performance in the residency program. It further asserted that Dr. Guo was not a "qualified individual with a disability" under the ADA and that she had not stated a claim under the FMLA.

¶ 15 The trial court granted MCMC's motion. It found that the terms of Dr. Guo's contract were set forth in the residency contract, the residency manual, the house staff manual and the requirements of the ABA. The court further stated that Dr. Guo's failure to pass oral and written examinations, along with her unsatisfactory performance on her rotations, despite MCMC's attempts to accommodate her needs, entitled MCMC to terminate her contract. The court also ruled that Dr. Guo had not met her burden of proof under the ADA or the FMLA. She then appealed to this court.

## DISCUSSION

¶ 16 On appeal from summary judgment, we view the evidence in the light most favorable to the party against whom summary judgment was entered. *L. Harvey Concrete, Inc. v. Agro Constr. & Supply Co.*, 189 Ariz. 178, 180, 939 P.2d 811, 813 (App. 1997). We determine *de novo* whether any genuine issue of material fact exists and whether the trial court erred in application of the law. *Id.* We may affirm a summary judgment even if the trial court reached the right result for the wrong reason. *Realty Assoc. of Sedona v. VNB*, 153 Ariz. 514, 521, 738 P.2d 1121, 1128 (App.1986).

### A. Breach of Contract

¶ 17 The construction of a contract is a question of law for the court. *Maganas v. Northroup*, 135 Ariz. 573, 575, 663 P.2d 565, 567 (1983). In interpreting the effect of a contract, "a standard of reasonableness" is utilized. *Gesina v. General Electric Co.*, 162 Ariz. 39, 45, 780 P.2d 1380, 1386 (App.1988).

3. Dr. Guo maintains that only the contract itself and specified addenda to the contract constituted the agreement between her and MCMC. However, in her quotation from the provision on the cover page of the employment contract, Dr. Guo fails to include the provision incorporating a list of contract sections and attachments. Included in that list is "SECTION I—GENERAL PROVI-

We construe a contract so as to give effect to all of its provisions. As a corollary, we do not construe one provision in a contract so as to render another provision meaningless. Where there is an inconsistency between two provisions in a contract, we will construe the more specific provision to qualify the more general provision.

*Norman v. Recreation Ctrs. of Sun City, Inc.*, 156 Ariz. 425, 427–28, 752 P.2d 514, 516–17 (App.1988) (citations omitted); *see Chandler Medical Bldg. Partners v. Chandler Dental Group*, 175 Ariz. 273, 277, 855 P.2d 787, 791 (App.1993).

¶ 18 Contrary to Dr. Guo's assertion, the terms and conditions of her contract are clearly set forth in the MCMC residency contract and appendices, the residency manual, the house staff manual and the requirements mandated by the ABA.[3] According to the MCMC contract, a term of a resident's employment is that the resident must agree to abide by "all policies, procedures and directives," as follows:

B. *Policies, Procedures and Directives:* The Resident agrees to abide by all policies, procedures, and directives as put forth by Maricopa County, Maricopa County Health Care Agency, Medical Center, Medical Staff of Maricopa Medical Center, Clinical Departments, the Department of Academic Affairs and within the House Staff manual.

"Directive" as used in this paragraph is defined in the employment agreement as:

[T]hose policies of a Clinical Department or Medical Center organizational unit, written or otherwise that guide it's [sic] members in their actions. These may take the form of, but are not limited to, memorandum [sic], handbooks, policies, procedures, and manuals.

SIONS," and that section includes the above-quoted provisions by which the resident agrees to abide by all MCMC policies, procedures and directives. Thus, any requirement for continuing in the residency program contained in the policies, procedures and directives was included in the contract between Dr. Guo and MCMC.

A resident's neglect of a duty or a violation of a policy under these provisions is grounds for termination.

¶ 19   In this context, each resident must demonstrate an acceptable level of knowledge in the fundamental principles of anesthesiology, an assessment of which includes an annual in-training examination, as well as the USMLE. A failure to achieve a passing score on the in-training examination mandates a six-month program review of the resident, and a failure to pass the examination a second time triggers possible suspension from the program.[4]   The three-part USMLE must be passed by the end of the program.

¶ 20   If a resident demonstrates deficiencies during training, it is MCMC's policy to place the resident on faculty-review process to provide individualized attention. The process includes faculty academic review, faculty clinical review and faculty program review: Faculty academic review is given to a resident who does not meet the minimum standards of knowledge; faculty clinical review applies to residents who have not demonstrated an appropriate level of competency in a clinical situation, and faculty program review is for those residents who have not satisfactorily met academic and clinical performance standards, as well as the overall responsibilities of a resident. If a resident does not pass the departmental written and oral examinations and show significant improvement in performance, then she can be placed on program probation, after which, if her performance remains unsatisfactory, she may be terminated.[5]

¶ 21   An employee's subjective personal assessment of her professional competence does not raise a genuine issue of material fact. *Bradley v. Harcourt, Brace & Co.,* 104 F.3d 267, 270 (9th Cir.1996).   Rather, we examine the record to determine whether MCMC complied with its employment policies, the propriety of which is not challenged.

¶ 22   Clearly, Dr. Guo had multiple serious problems over the course of her MCMC residency. Although she was initially placed on program review in September 1992 with specific conditions and accommodations, her examination scores remained below those of her peers, as she concedes, and her performance continued to be substandard. Dr. Guo also received negative feedback on her faculty and rotation evaluations. By November 1994, MCMC had placed her on official program probation. Although MCMC continued to give Dr. Guo ample opportunities to rectify her deficiencies as a resident in anesthesiology, and she was well aware of the conditions of her probation, including taking and passing the requisite examinations, Dr. Guo did not improve. As a consequence, according to the terms of its contract with Dr. Guo, MCMC was entitled to terminate her employment based on her consistently substandard evaluations and poor examination scores.

### B.   Americans With Disabilities Act

¶ 23   The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual ..." in discharging an employee.   42 U.S.C. § 12112(a).   To prevail on an ADA claim of unlawful discharge, the plaintiff must prove

---

4.   Dr. Calkins testified in his deposition that, pursuant to the resident manual, a resident who failed to pass an in-training examination was automatically placed on program probation, now referred to as program review.   He also stated that, according to the manual, by the completion of the residency, a resident was required to have passed all three sections of the licensing examination and passed the test to be board-certified.

5.   A memorandum to residents and attending physicians addressed faculty program review as follows:

Individuals given faculty program review have a high probability of receiving an unsatisfacto-

ry report to the American Board of Anesthesiology and given program probation, if there has been no demonstrated effort to rectify.   In order to be removed from Faculty Program Review, one must pass both a departmental written examination and a departmental oral examination, and show significant improvement in performance.   Any individual who receives Faculty Program Review for a second time will automatically be given program probation.   If no improvement is observed within thirty days of probation, steps towards dismissal from the program will begin.

(1) that she is a disabled person within the meaning of the ADA, (2) that she is qualified for. the position and able to perform the essential functions of the job, and (3) that the employer terminated her employment because of her disability. *Nunes v. Wal–Mart Stores, Inc.,* 164 F.3d 1243, 1246 (9th Cir. 1999); *Cooper v. Neiman Marcus Group,* 125 F.3d 786, 790 (9th Cir.1997). Accepting for the purpose of this case that Dr. Guo's depression constituted a disability under the ADA, we need address only the latter two elements.[6]

■ ¶ 24 Only persons who are qualified for the job may state a claim for discrimination. *Tyndall v. Nat'l Educ. Ctrs., Inc. of California,* 31 F.3d 209, 212 (4th Cir.1994). The ADA defines a "qualified individual with a disability" as

> an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.

42 U.S.C. § 12111(8). A person is "qualified" if she is "able to meet all of a program's requirements in spite of [her] handicap." *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979); *see also Halperin v. Abacus Tech. Corp.,* 128 F.3d 191, 197 (4th Cir.1997) (applying *Davis* quotation interpreting section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1976 ed., Supp. II), to ADA section 12111(8)); *Tyndall,* 31 F.3d at 213. Accordingly, to determine whether Dr. Guo was an individual qualified for the position of a resident in anesthesiology, we evaluate whether she could "perform the essential functions of the job" and whether "any reasonable accommodation by the employer would enable [her] to perform those functions." 42 U.S.C. § 12111(8); *Chandler v. City of Dallas,* 2 F.3d 1385, 1393–94 (5th Cir.1993).

■ ¶ 25 Dr. Guo, as the plaintiff, bears the burden of proof. *Tyndall,* 31 F.3d at 213. She argues that she was qualified to be a resident in the MCMC anesthesiology pro-gram because she could fulfill its essential demands if provided the reasonable accommodation of an additional year to complete her residency and· a medical leave to deal with her depression.

■ ¶ 26 The quality of Dr. Guo's performance was demonstrably inadequate during that portion of her residency she served. Despite extensive academic assistance, previous leaves, and psychiatric counseling and medication, Dr. Guo consistently failed to meet the conditions of the residency program. A medical leave on account of a disability may be a reasonable accommodation under the ADA in certain situations. *Nunes,* 164 F.3d at 1247; *Fredenburg v. Contra Costa County Dep't of Health Services,* 172 F.3d 1176, 1181 (9th Cir.1999); *but see Halperin,* 128 F.3d at 198 (employee who missed 46 days of work in six months and needed additional leave due to disability was not qualified; employee who is unable to come to work is unable to satisfy any of the functions of the job); *Tyndall,* 31 F.3d at 213 (employee who cannot met the attendance requirements of the job cannot be considered a "qualified" individual protected by ADA). But it was Dr. Guo's demonstrable lack of knowledge and clinical ability that rendered her unable to perform the essential functions of an anesthesiology resident.

■ ¶ 27 Additionally, even if Dr. Guo was a qualified individual, it is the initial burden and responsibility of the individual with a disability to advise her employer that an accommodation is needed. *Gantt v. Wilson Sporting Goods Co.,* 143 F.3d 1042, 1046–48 (6th Cir.1998), citing 29 C.F.R. § 1630.9. At no time did Dr. Guo ask that an additional year, a medical leave, her reinstatement or any combination of these be identified as an accommodation. Rather, on its own initiative, MCMC proposed that she take medical leave and extended her residency. When that failed, Dr. Guo still did not request any further action as an accommodation. And, indeed, there never has been an explanation of how the accommodations now sought

---

**6.** The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of such an individual." 42 U.S.C. § 12102(2)(A). Depression may constitute a disability. *Criado v. IBM Corp.,* 145 F.3d 437, 442–43 (1st Cir.1998).

**18**

would enable her to become a qualified individual.[7]

¶ 28 Given that Dr. Guo was not a qualified individual, we need not consider whether she was terminated because of her disability contrary to the ADA. Summary judgment for the defendant is appropriate if an ADA plaintiff fails to bear the burden of proving that she is a qualified individual with a disability who could perform the essential functions of the job with a reasonable accommodation as requested. *See Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 119 S.Ct. 1597, 1603, 143 L.Ed.2d 966 (1999). Accordingly, as the trial court concluded, MCMC was entitled to summary judgment on the ADA claim.[8]

### C. Family and Medical Leave Act Claim

¶ 29 Congress enacted the FMLA to "help working men and women balance the conflicting demands of work and personal life." *Price v. City of Fort Wayne*, 117 F.3d 1022, 1024 (7th Cir.1997); *see* 29 U.S.C. § 2601. Specifically, the statute provides eligible employees with twelve weeks of unpaid leave each year for "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). For purposes of the FMLA, "serious health condition" means an illness, injury, impairment, or physical or mental condition that involves inpatient care or continuing treatment by a health care provider. 29 C.F.R. § 825.114 (1995).[9] An employee who takes FMLA leave is entitled to return to the same or an equivalent position as was held before taking the leave, 29 U.S.C. § 2614(a)(1), and it is unlawful for an employer to interfere with, restrain or deny the exercise of any rights given under the FMLA. 29 U.S.C. § 2615(a)(1).[10] Dr. Guo charges that MCMC violated the FMLA because it required her to study for and take work-related examinations during her medical leave of May to July 1995.

¶ 30 The FMLA regulations delineate several circumstances constituting an "inter-

7. Even if Dr. Guo's assertion of requested accommodation in her complaint is accepted, she has not identified the length of leave necessary to get her depression under control so that she could return to work. *Rascon v. U.S. West Communications, Inc.*, 143 F.3d 1324, 1334 (10th Cir.1998)(An indefinite leave is not a reasonable accommodation if the employee fails to present evidence of the expected duration of her impairment.); *Gantt*, 143 F.3d at 1046–48 (An employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation, and it does not have to wait indefinitely for an employee's medical condition to be corrected.); *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir.1995).

8. Dr. Guo filed a disability benefit claim stating that she was not able to perform the essential functions of her job. While the application for and receipt of disability benefits do not automatically estop a claimant from seeking relief under the ADA, *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 119 S.Ct. 1597, 1600, 143 L.Ed.2d 966 (1999), a disability benefits claim nonetheless may conflict with an ADA claim. *Id.* at 1603; *see Johnson v. Oregon*, 141 F.3d 1361, 1366 (9th Cir.1998)("It is possible, due to the different definitions of disability employed by various agencies, to qualify for disability benefits and to satisfy the ADA's definition of a qualified person with a disability."). Thus, an ADA plaintiff cannot ignore the apparent contradiction but must sufficiently explain the conflict in the representations in order to prevail against

a motion for summary judgment. *Cleveland*, 119 S.Ct. at 1600.

9. MCMC. does not dispute that Dr. Guo had a serious health condition.

10. In addition to these requirements, the FMLA provides that an employee " 'need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed for an expected birth or adoption, for example.' " *See Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 761 (5th Cir.1995), quoting interim regulations at 29 C.F.R. § 825.302(c). As further explained by the court in *Price*:

> The FMLA does not require that an employee give notice of a desire to invoke the FMLA. Rather, it requires that the employee give notice of *need* for FMLA leave. This kind of notice is given when the employee requests leave for a covered reason. After a notice of this sort the employer can inquire further to determine if the FMLA applies.
> 117 F.3d at 1026.
> There is no evidence that Dr. Guo gave MCMC notice of her need for a leave in May 1995. However, Dr. Dingle did recommend to Dr. Calkins that Dr. Guo be placed on leave "to recuperate" and "get back on track." Thus, we will presume for purposes of this appeal that the recommendation of an employee's treating physician constitutes notice by the employee of need for leave that falls within the FMLA.

ference," such as refusing to authorize FMLA leave, discouraging an employee from using such leave, transferring employees from one worksite to another for the purpose of reducing worksites, changing the essential functions of the job in order to preclude the taking of leave, and reducing hours available to work in order to avoid employee eligibility. 29 C.F.R. § 825.220(b). Dr. Guo always was obliged to take and pass the in-training examination and USMLE. Until the time of her leave, she had not been successful. The requirement that she once again take the tests while on leave does not amount to an interference of her rights under the FMLA. Indeed, it was suggested that it would be easier for her to pass the examinations if she were relieved of her other duties at the time. Further, neither she nor Dr. Dingle ever asked MCMC to release Dr. Guo from the examination requirements that occurred during her leave. In fact, Dr. Guo acknowledged that, as of May 1995, she knew that she had to pass the tests in order to continue in the program, and she did not ask to be exempted from the testing requirements during her medical leave. MCMC did not in this way interfere with Dr. Guo's FMLA protection.

¶ 31 The FMLA expressly states that, if an employee is unable to perform an essential function of the job because of a physical or mental condition, she has no right to be restored to another position under the FMLA. 29 C.F.R. § 825.214. Given MCMC's ample reasons for termination unrelated to the medical leave during the summer of 1995, MCMC was not required to reinstate Dr. Guo after her leave, and it did not therefore breach her rights under the FMLA. *See Clay v. City of Chicago Dep't of Health*, 143 F.3d 1092, 1094 (7th Cir.1998) (A notification of termination upon an employee's return from FMLA leave did not violate either the ADA or the FMLA when evidence showed that she was replaced solely because of work deficiencies known before her leave.); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (Summary judgment in FMLA retaliation case proper when plaintiff did not show that employer's proffered reasons for her dismissal for deficient work performance were pretextual.).

## CONCLUSION

¶ 32 MCMC did not breach its contract with Dr. Guo, nor did it violate the ADA or the FMLA by failing to allow the accommodations she proposed or by failing to exempt her from required examinations given during her medical leave. We affirm the judgment in favor of MCMC.

CONCURRING: CECIL B. PATTERSON, Jr., Presiding Judge, and PHILIP E. TOCI, Judge.