938 P.2d 1124

**GREAT AMERICAN MORTGAGE, INC. formerly known as S.B.I. Mortgage, Inc., a Utah corporation, d/b/a Security Bancorp of Utah, Inc., d/b/a Security Mortgage; John D. Gilette, a married man dealing with his sole and separate property; James R. Cahoon, a married man dealing with his sole and separate property; Jan W. Smith, an unmarried woman; Maury D. Bergman, a married man dealing with his sole and separate property, Plaintiffs–Appellees,**

v.

**STATEWIDE INSURANCE COMPANY, an Illinois Corporation, Defendant–Appellant.**

No. 1 CA–CV 96–0353.

Court of Appeals of Arizona, Division 1, Department E.

Feb. 25, 1997.

Review Denied July 1, 1997.

Udall, Shumway, Blackhurst, Allen & Lyons, P.C. by Gregory L. Miles and E. Douglas Clark, Mesa, for Plaintiffs–Appellees.

Jennings & Haug by Mark E. Barker, Phoenix, for Defendant–Appellant.

OPINION

WEISBERG, Judge.

Statewide Insurance Company ("Statewide") appeals from the trial court's grant of summary judgment against it. For the following reasons, we reverse and remand with instructions to enter judgment in favor of Statewide.

**FACTUAL AND PROCEDURAL BACKGROUND**

The relevant facts are not in dispute. Security Bancorp, Inc. ("Security"), an Arizona

mortgage banking corporation, opened a branch office in Utah. Security then entered into employment contracts with Employees, who were loan officers for SBI Mortgage, Inc., a Utah mortgage brokerage firm that later became Great American Mortgage, Inc.[1]

Pursuant to these contracts, Employees were to originate mortgage loans for residential real property located in Utah for Security's purchase or refinance. The originating Utah employee was entitled to compensation as Security approved and funded each loan. The amount of wages paid to the employee was based upon a percentage of the profit that Security realized on that employee's loans. All actions taken by Security on the prospective loans, including their review, approval and funding, occurred in Arizona.

Employees originated approximately ninety loans for Security. At some point, however, due to financial difficulties, Security stopped paying Employees the wages they had earned. Employees then terminated their relationship with Security and sought recovery of their unpaid wages through the Utah Industrial Commission (the "Commission").

Security failed to appear at the hearing before the Commission, which awarded Employees $49,918.20 for their past due wages; $5,885.20 for their attorneys' fees; and, as a statutory penalty, damages equal to 100% per cent of the past due wages. The award against Security thus totalled $105,721.60.

To collect, Employees proceeded against the $100,000 Arizona license bond which Security was required to post in order to be licensed as a mortgage banker in Arizona. *See* Ariz.Rev.Stat. Ann. ("A.R.S.") § 6–943. The bond had been obtained from Statewide, an Illinois bonding company. When Statewide denied their claim against the bond, Employees filed this action against it.

Employees moved for summary judgment and Statewide filed a cross-motion for summary judgment. Statewide argued that Security's bond did not cover claims for employees' wages, sanctions imposed by the

Commission, or claims related to loans for real property located outside Arizona. The trial court initially granted summary judgment for Statewide because it concluded that, although the bond covered employee wage claims, it did not cover either sanctions or claims arising outside Arizona.

Employees then filed a motion for reconsideration, which the trial court granted. Relying upon *State ex rel. Corbin v. Pickrell,* 136 Ariz. 589, 667 P.2d 1304 (App.1983), the trial court concluded that the license bond was intended to protect "any injured person," including non-Arizona residents. The trial court therefore granted Employees summary judgment in the amount of the unpaid wages and attorneys' fees awarded by the Utah Industrial Commission, but denied recovery for the sanctions imposed by the Commission. Statewide has filed a timely notice of appeal from both the trial court's grant of Employees' motion for summary judgment and its denial of Statewide's.

## DISCUSSION

Statewide raises the following issues on appeal:

1. Does Statewide's bond cover Employees' claims for unpaid wages?

2. Does Statewide's bond cover claims arising from transactions involving real property located outside of Arizona?

3. Does Statewide's bond cover the award of Employers' attorneys' fees incurred in the Utah Industrial Commission action?

### I.

On review from summary judgment, we view the facts in the light most favorable to the party against whom judgment was entered. *Hill–Shafer Partnership v. Chilson Family Trust,* 165 Ariz. 469, 472, 799 P.2d 810, 813 (1990). Summary judgment is appropriate only where there exist no material facts in dispute and the moving party is entitled to judgment as a matter of law. *Colonial Tri–City Ltd. Partnership v. Ben*

---

1. Great American was also a named plaintiff in the instant case and remains a party, but has made no independent arguments. For simplicity, we will hereinafter refer only to Employees.

*Franklin Stores, Inc.*, 179 Ariz. 428, 432, 880 P.2d 648, 652 (App.1993). Our review of summary judgment is *de novo*. *Riley, Hoggatt & Suagee, P.C. v. English,* 177 Ariz. 10, 12, 864 P.2d 1042, 1044 (1993).

In addition, our view of the scope of Statewide's bond depends upon our interpretation of those statutes regulating the mortgage banking industry. Since statutory interpretation involves questions of law, we are not bound by the trial court's conclusions. *Siegel v. Arizona State Liquor Bd.,* 167 Ariz. 400, 401, 807 P.2d 1136, 1137 (App.1991).

## II.

Statewide issued its bond pursuant to A.R.S. section 6-943(H), which requires that a mortgage banker licensee deposit a bond with the Arizona Superintendent of Banks. The statute provides that

> [t]he bond shall be conditioned on the *faithful compliance of the licensee . . .* with this article. . . . The bond is payable to any person injured by the wrongful act, default, fraud or misrepresentation of the licensee and to this state for the benefit of any such person injured.

A.R.S. § 6-943(H). Employees premise their claim against the bond on Security Bancorp's violation of A.R.S. section 6-947(M), which provides:

> A mortgage banker shall not fail to truthfully account for the monies belonging to a party to a mortgage loan or mortgage banking loan transaction *or fail to disburse monies in accordance with his agreements.*

(Emphasis added.) Employees contend that, by failing to pay them wages due under their employment contracts, Security "fail[ed] to disburse monies in accordance with [its] agreements." *Id.*

Statewide in turn argues that Employees read this language too broadly, and that the bond does not cover their claims for unpaid wages. Statewide contends that employees are not within the class intended to be protected by the Legislature. With that, we agree.

We are fortunate to have a clear expression of legislative intent: "The legislature intends by this act to provide for regulation and licensing of mortgage brokers *in order to provide the public with the finest and most competent service in this important area.*" 1971 Ariz. Sess. Laws ch. 137, § 1 (emphasis added). Thus, the Legislature was concerned with protecting the public, i.e., borrowers and third parties adversely affected by a licensee's conduct as a mortgage banker, as opposed to its generic conduct engaged in by most unrelated businesses. The Legislature did not enunciate the goal of protecting the in-house personnel of regulated mortgage bankers.

Moreover, the statutory language that Employees rely upon is merely one subsection in a long list of "Prohibited Acts." *See* A.R.S. § 6-947. Examples of the prohibited acts are: permitting a party to a loan transaction to sign a document containing blank spaces, A.R.S. § 6-947(A); commingling its monies with that of borrowers, A.R.S. § 6-947(C); causing delay in a loan transaction that results in increased costs to a borrower, A.R.S. § 6-947(F); and accepting an assignment of the borrower's wages or salary, A.R.S. § 6-947(J). All of the acts prohibited by the statute are for the benefit of either borrowers or third parties adversely affected by the licensee's conduct as a mortgage banker. None purport to offer protection to a mortgage banker's employees.

A.R.S. section 6-943(I) lends further support to this interpretation. It provides that "[n]otwithstanding subsection H of this section [establishing the amount of the bond], the bond required shall be twenty-five thousand dollars for licensees whose investors are limited solely to institutional investors." "Investors" are persons providing funds to the mortgage banker intending that they be used to make the mortgage banker's loans, or purchasers of the mortgage banker's loans, A.R.S. § 6-943(J)(2); and "institutional investors" include entities that ordinarily require less protection in their financial dealings, such as banks and credit unions, *see* A.R.S. § 6-943(J)(1). By requiring a lesser bond for mortgage bankers dealing only with such investors, the Legislature underlines its intent to limit the bond's protection to those

persons injured by a licensee's mortgage banking activities.

Notwithstanding, Employees rely upon *Commercial Standard Ins. Co. v. West*, 74 Ariz. 359, 249 P.2d 830 (1952), in which our supreme court discussed the scope of the license bond required for used car dealers. *Commercial* arose from a licensed used car dealer's assignment to a bank of sales contracts that it had executed as seller. The practice was fraudulent because the dealer, Reid, was not the owner and seller, but merely signed the contracts for West, another dealer who did not enjoy the same assignment arrangement with the bank. When Reid failed to remit the proceeds of the assignments to him, West brought suit against both Reid and the surety on Reid's license bond. Employees narrowly cite the court's following language:

> The statute in question encompasses and the bond is given to cover the *business* of selling used cars. That this is more than just the actual sale or exchange of a used car is apparent from the statute itself.... A person who engages in the used car business, as in any business, must concern himself not alone with selling, but with all the myriad details required to conduct such a business.

*Id.* at 362, 249 P.2d at 832. The court's holding, however, was as follows:

> [T]he surety ... is liable to [West] for the conversion by defendant Reid of moneys belonging to [West], as the acts complained of arose out of Reid's actions in the capacity of a used car dealer. Had the latter not been a licensed dealer he would have been unable to follow the procedure outlined to procure for himself the commission out of the reserve fund which was set up at the bank for such dealers.

*Id.* at 363, 249 P.2d at 832.

In *Commercial*, Reid clearly was acting in his capacity as a used car dealer when he signed the sales contracts in place of West, assigned those contracts to the bank, and received the dealer's commission. The same is not true of Security's employment contracts with Employees. As to the language of *Commercial* upon which Employees rely, at best it is *dicta*, at worst it has been taken out of context. In either event, it does not control here.

We believe that the instant case is more analogous to *Insurance Co. of N. Am. v. General Elec. Credit Corp. ("GECC")*, 119 Ariz. 97, 579 P.2d 601 (App.1978), which also concerned the scope of a car dealer's license bond. In *GECC*, the licensee's inventory financer brought an action against the license bond because the licensee had failed to remit payments pursuant to their agreement. This court held that the bond did not cover the subject conduct:

> [The plaintiff] ... interprets [*Empire Fire & Marine Ins. Co. v. First Nat'l Bank*, 26 Ariz.App. 157, 546 P.2d 1166 (1976),] as holding that any unsatisfied secured creditor of a defaulting automobile dealer is automatically entitled to a claim against the dealer's license bond. We disagree. We do not believe such creditors are within the class of persons intended to be protected by the bond requirement.

*Id.* at 100, 579 P.2d at 604.

Similarly, if we were to interpret A.R.S. section 6–947(M) as Employees propose, all creditors of a mortgage banker would have recourse against the license bond. This would include, for example, a seller of office supplies or a provider of telephone service, and would distort the class of persons that the Legislature intended to protect by requiring a mortgage banker license bond, i.e., those persons wrongfully injured by the licensee's mortgage banking activities. Employees asserting their rights of employment simply do not fall within this protected class.

Moreover, exposing the license bond to such diverse claims would frustrate, rather than serve, the Legislature's intent of protecting the public. For example, an employee likely would be the first to realize the mortgage banker's financial difficulties and, by quickly filing an action, could exhaust the license bond before injured borrowers could act. This result would be particularly inequitable if the unpaid employee was partly responsible for the mortgage banker's financial difficulties. In any event, it would diminish the protection afforded the public by the Legislature, which would not accomplish our

duty to construe, where possible, remedial statutes liberally in favor of the class intended to be protected. *See Bogue v. Better–Bilt Aluminum Co.*, 179 Ariz. 22, 32, 875 P.2d 1327, 1337 (App.1994).

We therefore conclude that the trial court erred by ruling that Employees may recover against the bond provided by Statewide. Given this conclusion, we need not consider the two remaining issues.

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the trial court and remand with instructions to enter judgment in favor of Statewide.

KLEINSCHMIDT and VOSS, JJ., concur.