163 P.3d 1096

**BANNER HEALTH, an Arizona non-profit corporation, Plaintiff/Appellee,**

**v.**

**MEDICAL SAVINGS INSURANCE COMPANY, an entity of unknown domicile; Camryn Compeau, a minor; Henry Compeau and Geri Compeau, husband and wife; Thomas Parks and Elaine Parks husband and wife; Robert Duncan and Sandee Duncan, husband and wife; Jennifer Covey and Richard Covey, wife and husband; Alexandra Serrano, a minor Lawrence Serrano and Jane Doe Serrano, husband and wife; Megan Olson, a minor; Brett Olson and Barbara Olson, husband and wife, Defendants/Appellants.**

No. 1 CA–CV 05–0432.

Court of Appeals of Arizona, Division 1, Department D.

Aug. 14, 2007.

Review Denied Jan. 8, 2008.

The Karman Firm by Kirk Karman, Apache Junction, for Appellants Parks.

Schian Walker, P.L.C. by Michael R. Walker, Phoenix, for Appellants Compeaus.

Henley & Hicks, P.L.C. by J. Ridge Hicks, Mesa, for Appellants Duncans.

Gibson, Ferrn & Riggs, P.L.C. by Scott Gibson, Mesa, for Appellant Megan Olson.

Low & Childers, P.C. by David Childers, Christy C. Brown, Tasha N. Cycholl, Nathanael J. Scheer, Phoenix, for Appellant Medical Savings Insurance Company.

Carson Messinger Elliott Laughlin & Ragan, P.L.L.C. by Wallace L. Larson, Travis B. Hill, Phoenix, for Appellants Coveys.

O'Connor & Campbell, P.C., by Tamara S. McKane, J. Daniel Campbell, Phoenix, for Appellants Serranos.

Gammage and Burnham, P.L.C. by Richard B. Burnham, James A. Craft, Cameron C. Artigue, Phoenix, for Appellee.

## OPINION

GEMMILL, Judge.

¶ 1 Medical Savings Insurance Company ("MSIC") and the individually named defendants ("Patients") appeal from a judgment in favor of Banner Health. The Patients received medical services at various hospital facilities operated by Banner. After the Patients did not pay their respective invoices for the services, Banner filed suit to recover the amounts billed for its services. The trial court granted summary judgment to Banner. MSIC and the Patients claim that genuine issues of material fact exist regarding the prices charged by Banner for medical services under the "Conditions of Admission" ("COA") forms signed by the Patients. Because we conclude that the trial court correctly granted summary judgment in favor of Banner, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶ 2 MSIC is a health insurer that issued "group health insurance" to each of the Patients or their families. Banner is an Arizona non-profit corporation that owns and operates several hospitals throughout the state. The Patients were either patients of a Banner hospital or were spouses or parents of a Banner patient. Each of the patients or their representatives signed a COA form before Banner provided treatment. The COA form signed by four of the seven Patients included the following provisions:

> I agree that in return for the services provided to the patient by the hospital or other health care providers, I will pay the account of the patient.... I will pay the hospitals usual and customary charges, which are those rates filed annually with the Arizona Department of Health Services....

> ....

> It is understood that the undersigned and patient are primarily responsible for payment of patients bill.

(Emphasis removed.) The remaining three Patients signed a COA form that similarly promised to "pay the account of the patient" and acknowledged that the signer and the patient "are primarily responsible for payment of the patient's bill." These three COAs, however, did not include any provision referencing the "rates filed annually with the Arizona Department of Health Services."

¶ 3 After treatment, Banner billed each of the Patients the full amount specified for the provided medical services in its Charge Description Master ("CDM") that was filed with the Arizona Department of Health Services ("DHS") in accordance with Arizona Revised Statutes ("A.R.S.") sections 36–436 to –436.03 (2003).

¶ 4 The COA forms constituted the only agreements between Banner and the Patients regarding payment of Banner's charges. Banner has no agreements with MSIC. No insurance company contracts or

government programs require Banner to accept reduced payments in satisfaction of its billed charges to the Patients.

¶ 5 MSIC, as the medical insurer of the Patients, reviewed the charges billed by Banner using a methodology developed by the MSIC to "calculate the reasonableness of hospital charges and thus the reimbursement rates paid to medical providers." MSIC then tendered payment in the form of restrictively-endorsed checks[1] to Banner on the seven Patients' bills that ranged from approximately 15 to 43 per cent of the billed charges. Banner refused to negotiate these checks.

¶ 6 Banner sued the Patients and MSIC, asserting breach of contract for failure to pay. After Banner filed a motion for summary judgment, MSIC and the Patients argued that genuine issues of material fact existed because the amounts billed by Banner were unreasonable. MSIC and the Patients provided deposition testimony and various documents purporting to show that Banner charged the Patients over 400 per cent of its cost in providing their care, sought full payment from only 2 per cent of its customers, usually received only 34 per cent of its billed charges from patients who received treatment similar to that received by the Patients, and collected only 30 to 40 per cent of its overall billed charges annually.

¶ 7 The trial court granted summary judgment to Banner on its breach of contract claims against the Patients and awarded attorneys' fees to Banner against the Patients on a pro-rata basis. The Patients and MSIC, as a party adversely affected by the ruling, filed timely notices of appeal. This court has jurisdiction pursuant to A.R.S. § 12–120.21(A)(1) (2003).

### DISCUSSION

¶ 8 We conduct *de novo* review of a grant of summary judgment. *Great Am. Mortgage, Inc. v. Statewide Ins. Co.,* 189 Ariz. 123, 125, 938 P.2d 1124, 1126 (App.1997). We view the facts and all reasonable inferences therefrom in a light most favorable to the party against whom summary judgment was entered. *Id.* at 124, 938 P.2d at 1125. Summary judgment is appropriately granted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Orme Sch. v. Reeves,* 166 Ariz. 301, 305, 802 P.2d 1000, 1004 (1990). We will affirm a summary judgment that was correctly granted, even if we disagree with the trial courts reasoning. *See Guo v. Maricopa County Med. Ctr.,* 196 Ariz. 11, 15, ¶ 16, 992 P.2d 11, 15 (App.1999); *Realty Associates of Sedona v. Valley Nat'l Bank of Ariz.,* 153 Ariz. 514, 521, 738 P.2d 1121, 1128 (App.1986).

¶ 9 It is undisputed by the parties on appeal that valid contracts exist between each of the Patients and Banner.[2] What is contested, however, is the interpretation of the contracts with respect to the charges for the medical services. MSIC and the Patients argue that the price term is missing from the COAs, the amounts billed by Banner are unreasonable, the Patients should be responsible only for reasonable charges, and summary judgment should not have been granted because questions of fact exist regarding the reasonableness of the charges. Banner argues that it appropriately billed the Patients using the CDM rates and charges on file with the DHS. MSIC and the Patients are not challenging the treatment provided by Banner nor are they claiming that Banners charges did not correspond correctly with the rates filed with DHS.

¶ 10 The COA agreements must be interpreted in light of existing Arizona statutes pertaining to hospital rates. *See* 11 Richard A. Lord, Williston on Contracts § 30.19 (4th ed.2006) ("contractual language must be interpreted in light of existing law"). The legislature has enacted guidelines for the setting of hospital rates, and has established comprehensive procedures for the filing, re-

---

1. Each of the checks was marked "Payment in Full."

2. At oral argument before the trial court, at least one Patient argued that no contract existed because she was rendered incompetent by the circumstances existing when she signed the COA. This argument has not, however, been asserted on appeal.

view, and disclosure of hospital rates and charges. *See* A.R.S. §§ 36–436 to –436.03.

¶ 11 These statutes direct hospitals to use "the current edition of the statement on the financial requirements of health care institutions and services, as adopted by the American hospital association . . . as a guide for establishing hospital rates and charges." A.R.S. § 36–436(B). Nothing in the record suggests that Banner did not comply with this mandate when establishing its rates and charges.

¶ 12 Furthermore, hospitals "shall not engage in business within this state until there is filed a schedule of its rates and charges . . . with the director [of DHS] for the directors review." A.R.S. § 36–436(A). The director of DHS is given authority to determine the form of the schedule and the information contained therein. *Id.* The director is also responsible for adopting or establishing "reasonable guidelines for review of rates and charges." A.R.S. § 36–436(B). After the schedule is filed, "the director shall promptly review the schedule within sixty days and publish information on gross charges based on that schedule." A.R.S. § 36–436(C). The schedule must be legible, must list "all services performed and commodities furnished," "shall be posted in a conspicuous place in the reception area of each hospital," and must "be available for inspection by the public at all times." A.R.S. § 36–436.01(A), (B).

¶ 13 Hospitals cannot "increase any rate or charge until the proposed increase has been filed with the director [of DHS] and reviewed" as explained above. A.R.S. § 36–436.02(A); Ariz. Admin. Code R 9–11–303(B). Nor may hospitals reduce their rates and charges until a required filing has been made with the DHS director. A.R.S. § 36–436.02(B); A.A.C. R9–11–301(D) ("No decrease or deletion shall be made by any hospital . . . in any rate or charge until the proposed decrease or deletion has been filed for informational purposes with the Director.").

¶ 14 Accordingly, the published rates and charges of a hospital cannot be increased without going through the filing and review process, nor may the rates be decreased without a formal filing with the DHS. Although the rates and charges for a particular service are the same for every patient, hospitals are free to accept reduced payments in satisfaction of the full billed rates. This frequently occurs, for example, as a result of government programs and contracts with health care insurers. The amounts accepted by a hospital in satisfaction of its billed charges will vary, but the billed rates and charges for specific services do not. Arizona law does not permit a hospital to reduce its filed rates and charges—and therefore its billed rates and charges—without making further filings with the DHS. *See id.*

¶ 15 "It has long been the rule in Arizona that a valid statute is automatically part of any contract affected by it, even if the statute is not specifically mentioned in the contract." *Higginbottom v. State*, 203 Ariz. 139, 142, ¶ 11, 51 P.3d 972, 975 (App.2002) (citing *Yeazell v. Copins*, 98 Ariz. 109, 113, 402 P.2d 541, 544 (1965), *Lee Moor Contracting Co. v. Hardwicke*, 56 Ariz. 149, 156, 106 P.2d 332, 335 (1940), and *Havasu Heights Ranch & Dev. Corp. v. Desert Valley Wood Products, Inc.*, 167 Ariz. 383, 389, 807 P.2d 1119, 1125 (App.1990)). Therefore, these Arizona statutes and regulations are incorporated by operation of law into the COA agreements. Because of the statutory scheme and the resultant publishing of Banner's rates and charges, there are no "open" or missing price terms in the COA agreements.

¶ 16 In four of the COA agreements, the Patients agreed to pay "the hospital's usual and customary charges, which are those rates filed annually with the Arizona Department of Health Services." Under this language, patients expressly agree to pay the rates and charges filed annually by Banner with DHS. The reference to the hospital's "usual and customary charges" does not create any ambiguity or question of fact, because such charges are defined in the COAs as the rates filed with DHS. MSIC and the Patients acknowledge that Banner billed the Patients in accordance with its filed rates.

¶ 17 In three of the COA agreements, the Patients agreed to "pay the account" and acknowledged that the signer and the patient "are primarily responsible for payment of the patient's bill." The actual charges billed by Banner to the Patients were, as required by the statutes and regulations, the filed rates and charges. But because these three COA agreements do not expressly reference the hospital rates and charges filed with DHS, MSIC and the Patients argue that the court must fill the "missing price term" with "reasonable" rates and charges. We disagree. The price terms are supplied by the hospitals' filed rates and charges.

¶ 18 The statutes and regulations summarized in ¶¶ 10–13, *supra*, constitute part of the COA agreements and the agreements must be interpreted with this statutory scheme in view.[3] The statutes and regulations require the filing and publishing of the hospitals' rates and charges, which are the current prices for which the hospitals offer their services to members of the public. When the Patients agreed to be responsible for the "bill" and to "pay the account," they agreed to pay the hospitals charges calculated in accordance with the filed rates and charges. The Restatement (Second) of Contracts provides an analogous Illustration regarding the existence of a price term necessary to formation of a contract:

1. A telephones to his grocer, "Send me a ten-pound bag of flour." The grocer sends it. A has thereby promised to pay the grocer's current price therefor.

Restatement (Second) of Contracts § 4 cmt. a, Illus. 1 (1981). The fact that a hospital could choose to accept a reduced amount in satisfaction of the full billed charges—as, for example, when a hospital has a contract with an insurer or has agreed to provide services under a government program—does not mean that there is a missing price term in these three COA agreements.

¶ 19 The dissent cites *Doe v. HCA Health Services of Tennessee, Inc.*, 46 S.W.3d 191 (Tenn.2001), in support of the proposition that the price term is missing and a reasonable price should be determined by the quasi-contractual remedy of quantum meruit. *See infra* ¶ 45. But *Doe* involved very different facts. There was no statutory scheme governing the setting, filing, and publishing of hospital rates and charges; the hospital's "Charge Master" rates were in fact confidential and not ascertainable by a patient; and the contract with the patient contained no reference to the "Charge Master" rates. 46 S.W.3d at 193–94. The *Doe* court concluded that the contract was "indefinite" and unenforceable because it did "not refer to a document or extrinsic facts by which the price will be determined." *Id.* at 197. In contrast, the three COA agreements here include by operation of law the Arizona statutory scheme that requires the filing and publishing of each hospital's rates. Banner's rates and charges were filed and available for review and comparison by the public and these Patients. Because the statutory scheme is incorporated into these agreements and reveals the system of filed rates, the agreements therefore refer to "extrinsic facts"— the rates that are required to be filed and published—from which the hospitals' bills to the Patients were determined.

¶ 20 Having concluded that there are no open or missing price terms in the COA agreements, we necessarily reject the contentions of MSIC and the Patients that a "reasonable" price term must be implied into the contracts and determined by negotiation or litigation after the services have been rendered.

¶ 21 Even though the Patients are not insured by any entity with which Banner has agreed to accept less than its published rates in full satisfaction of its bills, MSIC and the Patients contend that it is unfair for Banner to charge them more than it accepts in full payment from insured patients and patients under government contracts. There is nothing illegal or unauthorized, however,

---

**3.** Our dissenting colleague incorrectly characterizes our analysis when he states that we conclude that the filed rates are incorporated as a matter of law into the three COA agreements that do not specifically reference them. *See infra* ¶¶ 29, 32, and n. 5. It is the statutory scheme that requires the filing and publishing of the rates that is incorporated into these three COA agreements, not the actual rates and charges.

152

about hospitals contracting with insurers and government entities to accept reduced payments in satisfaction of their published rates, in return for an anticipated volume of business and prompt payments. Nor does the fact that hospitals routinely accept reduced payments on behalf of many patients mean that the published and billed rates are unreasonable. *See Huntington Hosp. v. Abrandt,* 4 Misc.3d 1, 779 N.Y.S.2d 891, 892 (App. Term 2004) ("The fact that lesser amounts for the same services may be accepted from commercial insurers or government programs as payment in full does not indicate that the amounts charged to defendant were not reasonable.").

¶ 22 The Georgia Court of Appeals has recently rejected similar arguments presented by uninsured patients against hospitals. In *Cox v. Athens Regional Medical Center, Inc.,* 279 Ga.App. 586, 631 S.E.2d 792 (2006), the patients argued that the hospital had not charged them "reasonable" rates and that the rates charged were unfair because the hospital charged its insured patients much lower rates. Because the contracts signed by the patients obligated them to pay the hospital "in accordance with the rates and terms of the hospital," the patients asserted that there were "open" price terms for which "reasonable" prices must be substituted by the court. *Id.* at 796. The court noted that the Georgia legislature had enacted statutes requiring the filing and disclosure of hospital rates and charges, and further noted that laws in existence at the time a contract is created are part of the contract. *Id.* at 797. The court affirmed summary judgment in favor of the hospital, reasoning in part as follows:

> Moreover, appellants do not allege that they requested pricing information and [the hospital] failed to comply with this scheme, or that the required written summary of charges would not have been available to them upon request. Indeed, the language in [the hospital]'s admission form readily dovetails with the General Assembly's price-comparison scheme at OCGA § 31–7–11(a) (which puts the burden on patients to request the pricing information), because it puts patients on notice that they will be charged rates established

by [the hospital]. While appellants may deem it desirable for [the hospital] to make reference to available pricing information in its admission form, this is by no means required by OCGA § 31–7–11(a); therefore, its absence from the admission form is not grounds for reversal.

631 S.E.2d at 797. The court in *Cox* also recognized that it must, under the circumstances, defer to the legislature in light of the statutory scheme in existence:

> At the heart of this case is the notion that those who do not participate in an insurance policy do not benefit from the lower rates hospitals charge insured patients. Appellants do not allege that [the hospital] has violated any of the statutory schemes noted here; they simply challenge the fairness of charging uninsured patients more than insured patients. In doing so, they ultimately seek judicial intervention in a commercial transaction (for which the legislature has already established a policy favoring price comparison by the patient), whereby judges and juries would be called on to set appropriate prices for hospitals to charge their patients. We do not answer this call, and instead address the legal arguments properly presented before us.

*Id.* at 795.

¶ 23 Similarly, in *Morrell v. Wellstar Health System, Inc.,* 280 Ga.App. 1, 633 S.E.2d 68 (2006), another panel of the Georgia Court of Appeals affirmed summary judgment in favor of a hospital against uninsured patients who claimed they were overcharged. Each contract provided that the patient "accept[ed] full financial responsibility for all charges incurred for services received today." *Id.* at 71. The patients argued that these were "open price" contracts that contained an implied agreement for the hospital to charge a reasonable amount and that the hospital breached the contracts by billing the full "chargemaster" rates. *Id.* As in *Cox,* the *Morrell* court examined the Georgia statutes and noted that "statutory provisions related to the contract construction must be considered a part of the contract." *Id.* The court affirmed the finding of no breach of contract:

The rules of contract construction enabled the trial court to conclude that the agreement in the contracts to pay for "all charges" unambiguously referred to the written summary of specific charges required by OCGA § 31–7–11(a) which established the price terms on which the parties intended to bind themselves. It follows that the Morrells and [the hospital] agreed to contracts for payment of all charges for medical care provided at the "chargemaster" rates, and [the hospital] did not breach the contracts by charging those rates.

633 S.E.2d at 72 (citations omitted). Our conclusions here are supported by the reasoning and holdings of *Cox* and *Morrell.*[4]

¶ 24 MSIC and the Patients further argue that the COA agreements should be declared unenforceable because enforcing the filed (and billed) rates would violate the Patients' reasonable expectations and be unconscionable. These arguments fail to take into account the public filing of the rates and Banner's compliance with the legislatively-created process for setting and filing the rates and charges. Hospitals are required to follow specified guidelines in setting their rates; and then the rates are filed with DHS, reviewed by the Director, disclosed publicly, and available upon request. MSIC and the Patients have not asserted that these statutes and regulations are invalid, that Banner failed to follow the specified guidelines and procedures, that the actual billed rates were not in accordance with the filed rates, or that the services and supplies for which the Patients were billed were not provided as described. Because Banner followed the statutory and regulatory procedures and Banner's rates are filed and available to the public, we conclude as a matter of law that there is no violation of the Patients' reasonable expectations. We similarly conclude that the potential application of the equitable doctrine of unconscionability is significantly narrowed under these circumstances and, as a matter of law, the billed rates and charges are not unconscionable. We do not believe it is within the province of the courts, on this record, to declare billings based on the filed rates to be unenforceable.

¶ 25 Finally, MSIC and the Patients also contend that the trial court erred by distinguishing and not applying *LaBombard v. Samaritan Health System,* 195 Ariz. 543, 991 P.2d 246 (App.1998). *LaBombard* involved a dispute between a hospital and an individual over funds received in settlement of a personal injury claim. The hospital had a statutory lien for its "customary charges" under A.R.S. § 33–931 (2007). This court held that a genuine issue of material fact existed regarding whether the hospital's "customary charges" under this statutory language were the same as its "billed charges." *Id.* at 552, ¶ 35, 991 P.2d at 255.

¶ 26 *LaBombard* is inapposite. The issue of "customary" charges under the lien statute is quite different from the question whether the COA agreements will be enforced using the filed CDM rates and charges. Although four of the COA agreements mention "customary charges," this phrase is specifically defined to mean the rates and charges filed with DHS. Because these four agreements provide the definition, no question arises regarding the meaning of "customary charges." The trial court correctly determined that *LaBombard* does not apply here.

¶ 27 Both parties have asked this court to award attorneys' fees on appeal under A.R.S. § 12–341.01(A) (2003). Banner is the prevailing party on appeal. In the exercise of our discretion, we will grant Banner an award of reasonable attorneys' fees on appeal, in an amount to be determined upon compliance with ARCAP 21.

## CONCLUSION

¶ 28 For these reasons, we affirm.

CONCURRING: PATRICIA A. OROZCO, Judge.

---

4.  *See also Shelton v. Duke Univ. Health Sys., Inc.,* 633 S.E.2d 113, 116 (N.C.App.2006) (holding that hospital did not breach contract with uninsured patient by charging the full "charge master" rates, when contract obligated patient to pay "the regular rates and terms" of hospital).

KESSLER, Presiding Judge, concurring in part and dissenting in part:

¶ 29 I respectfully dissent in part and concur in part. I believe the superior court and the majority err by holding that Banner's respective chargemaster rates on file with DHS ("the filed rates") were incorporated into the Condition of Admission forms ("COAs") that did not explicitly refer to those rates. Additionally, while I agree that the filed rates were properly incorporated into those COAs that referred to the filed rates, I believe that the majority and the superior court err by declining to address whether those rates are unconscionable contract terms. I would reverse the court's order of summary judgment and remand for: (1) a determination of reasonable price terms for the COAs that do not refer to the filed rates; and (2) findings of fact and conclusions of law as to whether the filed rates were unconscionable price terms in those COAs that refer to the filed rates.

## DISCUSSION

¶ 30 This case concerns a group of plaintiffs who are insured by MSIC and who were patients or whose dependents were patients at various Banner hospitals. Many, but not all, signed COAs after they or their dependents arrived at or were transported to urgent care or emergency facilities with pressing medical conditions. All of the individual plaintiffs stated by affidavit that no Banner representative explained the COAs to them at the time they were asked to sign.

¶ 31 A proper analysis of this case requires division of the individual plaintiffs into two groups. One group of plaintiffs signed COAs prepared by Banner stating they would pay their accounts, but not explicitly stating what the rate of charge would be. The other group of plaintiffs signed COAs explicitly

stating that the charges would correspond with the filed rates.

## I. COAs Not Referring To Filed Rates: Arizona's Rate Filing Scheme

¶ 32 I agree with the majority that the filed rates were incorporated as price terms in those COAs that referred specifically to the filed rates. I disagree with the majority's conclusion that the filed rates were incorporated as a matter of law into those COAs that did not refer to the filed rates. A close examination of the statutory and regulatory scheme upon which the majority relies leads to a contrary conclusion.[5]

¶ 33 A valid statute is automatically incorporated into any contract, regardless of whether the contract specifically refers to it. *Higginbottom v. State*, 203 Ariz. 139, 142, ¶ 11, 51 P.3d 972, 975 (App.2002). Thus, the language of a contract should always be construed in light of existing statutes and laws, and when the language of the contract is incompatible with that law, the law governs. *Id.* Before applying a statute to a contract, courts should determine its meaning in order to effectuate the intent of the legislature. *Id.* at ¶ 13.

¶ 34 If the legislature or the Department of Health Services ("DHS") had established statutes and/or regulations that proscribed the rates chargeable at hospitals, those rates would have been incorporated into the COAs under the above principles. The statutory scheme upon which the majority relies, however, does not do so, and therefore provides no price term to incorporate into the COAs. Nor do common law principles cited to by the majority permit the incorporation of the filed rates into these COAs.

¶ 35 Title 36, Chapter 4, Article 3 ("Article 3") of the Arizona Revised Statutes[6] is titled, "Review of Rates, Rules and Regulations." Under that Article, a hospital may not en-

---

**5.** The majority states that the filed rates are not read into the COAs, but only that the relevant statutes are so incorporated and that the filed rates permitted by the statutory scheme then provide any allegedly missing term. *Supra,* ¶¶ 15 and 18 and n. 3. This is a distinction without a difference. It is the majority's interpretation of the statutory scheme requiring the filing of unapproved rates that leads the majority to conclude

the legislature has provided the missing terms to any COA unless the patient expressly provides in a COA for another rate to apply or other rates are expressly applicable through government regulations or third-party agreements.

**6.** A.R.S. § 36–436 et seq.

gage in business unless there is a filed schedule of its rates and charges, as well as any rules pertaining to those rates, with the DHS director. A.R.S. § 36–436(A) (2003). The DHS director is then required to review and publish information on those charges. A.R.S. § 36–436(B) & (C). A hospital may not increase a rate until the rate has been filed and reviewed by the DHS director, and any proposed reduction in rates must be filed with the DHS director "for informational purposes" before the reduced rate goes into effect. A.R.S. § 36–436.02. DHS regulations enacted pursuant to Article 3 specify the time, place, and manner by which a hospital must file its schedule of charges with the director, but do not indicate any method of substantive review the director should take concerning those schedules. *See* A.A.C. R9–11–201 et seq. & R9–11–301 et seq. As Banner conceded, there are no provisions in either Article 3 or its corollary regulations under which the director may reject or augment a hospital's filed rates.

¶ 36 This has not always been the statutory scheme for the filing of scheduled rates. What is now Article 3 was initially enacted in 1971. Laws 1971 Ch. 196 § 2. At that time, the statute required the director to publish information about how the rates and charges related to operating costs, financial conditions, occupancy rates, and services provided. *Id.* In 1973, the legislature added that the guidelines for establishing rates and charges should relate to the AHA Statement on Financial Requirements of Healthcare Institutions. Laws 1973 Ch. 127 § 5.

¶ 37 In 1982, the legislature established the Healthcare Cost and Regulation Committee for the purpose of making "recommendations regarding changes in state laws and regulations necessary to achieve greater competition in the healthcare industry and the containment of costs through the operation of the market rather than government regulation." Laws 1982 ch. 315 § 6. That committee met from 1982–1983 to discuss promoting the free market operation of the healthcare industry. *See Minutes of the Health Care Cost and Regulation Committee,* December 20, 1982; *Health Care Cost Containment Issue Papers; Minutes of the Health Care Cost and Regulation Committee, Subcommittee A,* April 11, 1983 & May 9, 1983; *Minutes of the Health Care Cost and Regulation Committee, Subcommittee B,* May 2, 1983. In particular, the committee focused on deregulation of hospital operations and increasing publication of comparative hospital rates so that the hospitals would operate like competitive, for-profit businesses. *Id.*

¶ 38 The legislature responded by passing legislation instructing the director to publish semi-annual comparative reports of hospital charges. Laws 1983 ch. 266 sec. 2. Ultimately, in 1994, the legislature removed the director's duties to review the hospitals' rates under the AHA guidelines and to publish a comparison between the hospitals' filed rates and their operating expenses. Laws 1994 ch. 115.

¶ 39 The history of Article 3 reveals a trajectory of increased deregulation and reliance on market conditions and private action to control the price of healthcare. The director was initially vested with the power and the duty to conduct a substantive review of the rates against objective guidelines and to publish a qualitative analysis of those rates, but ultimately was divested of this power in favor of letting the industry regulate itself in the area of pricing. As Banner's System Vice President of Finance aptly described, Arizona is not a rate review state, but a filing state; the price rates for hospitals are controlled by a mixture of factors, including: public perception, desire not to have the highest rates compared with other like hospitals, physician input, and "market basket comparisons." Pursuant to legislative intent, the cost of healthcare in Arizona is driven not by government regulation, but by market forces.

¶ 40 Thus, the filing system intentionally contains no substantive legislative or administrative mandate as to the cost of healthcare in any hospital. It is merely a publication vehicle meant to facilitate free market forces within the healthcare field. In light of this, it is particularly salient that, while hospitals need only notify the director of rate *decreases* for informational purposes, they may not effect a rate *increase* until that increase has

been filed and reviewed by the director. Nowhere in the statutory or regulatory scheme does it state that hospitals may not charge a rate lower than the published rate, for such a requirement would not comport with the market behavior the legislature has sought to encourage. Because "nobody wants to be at the top of the list" of published rate increases for the sake of public perception, as Banner's System Vice President of Finance pointed out, the legislature has decided to control healthcare costs through the free market by publishing the *highest* present chargeable cost. As Banner observed, the escalation of healthcare costs is supposed to be kept in check when the highest possible rate of charge is subject to public and market scrutiny.[7]

¶ 41 The filed rates, then, are the highest rates a hospital could charge a patient for its services, published for the purpose of encouraging competition among healthcare institutions. To state that they are the *only* rates chargeable under the law not only misconstrues the effect of the statute, but also its purpose. The legislature had no intent *to create* a schedule of rates by which the hospitals *must* operate. Its intent was exactly the opposite: to deregulate the cost of healthcare and allow for private forces to assume that responsibility. The filed rates are no legal mandate on the healthcare industry, and therefore are not automatically incorporated into the COAs as price terms by operation of law.

¶ 42 The majority also relies upon the Restatement (Second) of Contracts to contend that a patient who signs a COA not referring to the filed rates is still bound by those rates because he is just like a customer calling a grocer, ordering a ten-pound bag of flour and thus agreeing implicitly to pay whatever the current price charged for that product. *Supra*, ¶ 18, quoting from Restatement (Second) of Contracts § 4 cmt. a, Illus. 1 (1981). That analogy fails, however, for two reasons. First, that illustration in the Restatement is

not provided to show what the terms of the contract are, but only that the customer has entered into a contract. *Id.*, cmt. 1 (stating that an assent and intent to contract may be manifested by words or other conduct). Neither the patients nor MSIC claims that there was no agreement for the hospital to provide and the patients to accept healthcare services.

¶ 43 Second, that analogy is factually faulty. This is not a situation in which a customer calls a retailer and asks for a specific product, impliedly agreeing to pay a current price. The filed rates in this case consisted of 576 pages of single-spaced services and products, many of which are meaningless to anyone until the service is provided. For example, the hospital's filed rates included $2,140 if a patient needed a "shaft femoral 15.0cm," but $1,968 if he needed a "shaft femoral VFEMS70SP." A patient coming to his local hospital is not going to tell the doctor or admitting person that he wants a "shaft femoral 15.0cm"; he only wants to be diagnosed and hopefully cured of his condition. Unlike a customer calling his local grocer for a ten-pound bag of flour, most often a patient has no idea exactly what services and products he might need after being admitted to the hospital. Thus, he is not ordering a specific product. Nor is he agreeing to pay a "current rate" for all such products and services unless the COA says so. To hold a patient has implicitly agreed to pay any one or more of 576 pages of single-spaced impenetrable filed rates simply by stating he would pay his hospital account is the modern day equivalent of the information given persons entering Dante Alighieri's vision of purgatory.[8]

¶ 44 I would therefore hold that the filed rates do not constitute a price term incorporated into the COAs that do not refer directly to them. Those COAs that do not refer to the filed rates, or any rate of charges, lack

---

7. Banner argues the statutory scheme mandates that it charge the filed rates. In so arguing, it distinguishes what it "charges," or bills, from the amount it ultimately collects from patients. Regardless of Banner's billing and collection practices, the statutory scheme does not mandate that

a hospital has to "charge" or bill only the scheduled rates filed with DHS.

8. Dante Alighieri, *The Divine Comedy*, Purgatory, canto iii, l. 9 (C.H. Sisson, trans., Oxford University Press 1993).

price terms.[9] The superior court's ruling stated that all of the COAs included the filed rates as their price terms. Unlike the majority, I would hold that the court erred in this finding, and would remand for proceedings to determine a reasonable price term. *See AROK Const. Co. v. Indian Const. Services,* 174 Ariz. 291, 298, 848 P.2d 870, 877 (App.1993) (when price term omitted from contract, court may look to extrinsic evidence to supply term).

¶ 45 A similar result was reached in *Doe v. HCA Health Services of Tennessee, Inc.,* 46 S.W.3d 191 (Tenn.2001). In *Doe,* the hospital did not refer to its chargemaster rates in the assignment of benefits it required the patient to sign. 46 S.W.3d at 194. Rather, the assignment merely stated that the patient would be "financially responsible to the hospital for charges not covered by this authorization". *Id.* The Tennessee Supreme Court held that, by failing to refer to the chargemaster rates in the agreement, the price term was left open. 46 S.W.3d at 197. The court then held that, given that indefiniteness, a court would have to determine the price term by the quasi-contractual remedy of quantum meruit, that is, the reasonable value of the services provided. 46 S.W.3d at 197–99.[10] *Doe* is one approach courts have taken to resolving disputed hospital charges when the legislative branch has not occupied

the field. Leah Snyder Batchis, *Can Lawsuits Help the Uninsured Access Affordable Hospital Care? Potential Theories for Uninsured Patient Plaintiffs,* 78 Temp. L.Rev. 493, 521–38 (2005).

## II. COAs Referring to Filed Rates: Equitable Defenses to Enforcement

¶ 46 Even when the filed rates are incorporated as a price term to the contracts, these terms are not immune to equitable defenses to contract. MSIC and the patients argued before both the superior court and this Court that the price terms of the contracts violated the parties' reasonable expectations and were unconscionable. Neither the superior court nor the majority has addressed these arguments in any substance.

¶ 47 The majority reasons that we are precluded from passing on whether the price terms in the contracts exceed the reasonable expectations of the parties or are unconscionable because they are "sanctioned by a legislatively-created process." As noted above, I disagree with the majority's characterization of the rate filing scheme. It is a publication scheme designed to foster free market competition, rather than a regulatory scheme designed to influence the rates charged for healthcare.

9. Banner cites several out-of-state cases to support its contention that the filed rates are nonetheless incorporated by reference into those COAs. Each of those cases is distinguishable. In both *Morrell v. Wellstar Health Sys., Inc.,* 280 Ga.App. 1, 633 S.E.2d 68 (2006), and *Cox v. Athens Regional Medical Center,* 279 Ga.App. 586, 631 S.E.2d 792 (2006), the Georgia Court of Appeals held that, because Georgia law mandated that hospitals provide a "simple clear" summary of hospital charges to patients to facilitate cost-effective decisions, those chargemaster rates were incorporated into the patients' agreements to pay. 633 S.E.2d at 71–72, 631 S.E.2d at 797. Article 3 contains no such requirement for a "simple clear" summary, as its intent is geared more toward facilitating market forces than individual cost-effective decisions. Here, in contrast, one of Banner's chargemasters, admitted into evidence, was 576 pages long and contained numerous complex descriptions of charges.

Additionally, in both cases, the agreements to pay in *Morrell* and *Cox* contained at least oblique references to price terms, whereas here there are no price terms mentioned in the COAs that do

not refer to the filed rates. *See Morrell,* 633 S.E.2d at 71–72 ("all charges incurred"); *Cox,* 631 S.E.2d at 795 ("in accordance with the rates and terms of the hospital").

The remaining cases cited, *Howard v. Willis-Knighton Medical Center,* 924 So.2d 1245 (La. App.2006), and *Harrison v. Christus St. Patrick Hosp.,* 430 F.Supp.2d 591 (W.D.La.2006), are so procedurally distinguishable from this case as to have little or no substantive bearing upon the analysis here.

10. The majority seeks to distinguish *Doe* on the grounds that the chargemaster rates were confidential and there was no statutory scheme allegedly incorporating such rates into contracts of admission. While the chargemaster rates in *Doe* were confidential, 46 S.W.3d at 194, that was not the basis of the court's decision. Rather, it was the failure of the hospital to incorporate a reference to the filed rates into the agreement. 46 S.W.3d at 197. Here, the absence of any reference to the filed rates in the COAs and the lack of any statutory scheme making the filed rates the charged rates, yields the same result.

158

¶ 48 While courts will not interfere with a proper application of a statute by an exercise of their equitable powers when "the legislature has clearly spoken by statute on a substantive matter within its domain," *Hobson v. Mid–Century Ins. Co.*, 199 Ariz. 525, 531, ¶ 20, 19 P.3d 1241, 1247 (App.2001), that principle does not apply to this case. The legislature has not clearly precluded judicial determination of whether those terms exceed patients' reasonable expectations or are unconscionable. As noted above, the statute creates a procedure for the publication of price terms. It does not, however, state that the rates published are reasonable or conscionable, nor should we extrapolate any such imprimatur from the publication procedure. *See Kiley v. Jennings, Strouss & Salmon*, 187 Ariz. 136, 141, 927 P.2d 796, 801 (App.1996) ("We will not supply meaning not enunciated in the statute.").

¶ 49 Thus, there is nothing of substance to prevent this Court or the superior court from addressing whether the price terms exceeded the patients' reasonable expectations or were unconscionable. Absent any such clear legislative preclusion, courts should do what they do everyday—apply well-established principles of law *and equity* to the facts before them, for, as our supreme court has noted:

> The judicial power is not dependent on the legislative branch. The judicial mandate, intended to secure equal and substantial justice under the rule of law, is delegated to the judiciary by the constitution, not the legislature. The preamble would limit the mandate by restricting the judicial power-a constitutional power sometimes neglected in the unpredictable maelstrom of partisan politics.

*Cronin v. Sheldon*, 195 Ariz. 531, 538, ¶ 31, 991 P.2d 231, 238 (1999).

¶ 50 The contracts in this case were clearly contracts of adhesion. *See Broemmer v. Abortion Services of Phoenix, Ltd.*, 173 Ariz. 148, 151, 840 P.2d 1013, 1016 (1992). Contracts of adhesion are generally fully enforceable according to their terms. *Id.* Courts will not, however, enforce a contract or a term of a contract if the contract or term exceeds a party's reasonable expectations. *Id.* Additionally, as a matter of equity, the

courts will not enforce a contract or a term thereof if it is unconscionable. *Id.*

¶ 51 According to the "reasonable expectation" rule, while a party is typically bound by the terms of an adhesion contract even when they do not know the details of the terms of the contract, they are not bound by the unknown terms of the contract that are beyond the range of reasonable expectation. *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 391, 682 P.2d 388, 396 (1984). A term may be deemed to exceed the party's reasonable expectation when the party enforcing the term has reason to believe the party against whom the agreement is enforced would not have accepted the agreement had he or she known the agreement contained that term. *Id.* at 392, 682 P.2d at 397. In determining whether a party enforcing an agreement had reason to believe the term exceeded the other party's reasonable expectations, courts may examine factors including: whether the term is bizarre or oppressive, whether the term eviscerates non-standard terms specifically agreed to, whether the term eliminates the dominant purpose of the contract, whether the other party had an opportunity to read the term, and whether the term is illegible or otherwise hidden from view. *Id.*

¶ 52 With regard to those COAs containing explicit references to the hospitals' filed rates, the balance of the circumstances surrounding those agreements indicates those price terms did not exceed the reasonable expectation of the parties. The COAs were essentially agreements to pay, and the references to the filed rates as the charges to be paid were an integral term of those agreements. Thus, the reference to the filed rates was in fact coextensive with the dominant agreement in the COAs, and certainly did not eviscerate the dominant purpose of the COAs. Although the patients have stated that they did not expect to be charged excessive rates, none of the parties who signed COAs containing specific references to the filed rates stated that they did not expect to be charged the filed rates as indicated in the COA. Thus, the use of the filed rates as the price term in the COAs referring explicitly to

the filed rates did not exceed the parties' reasonable expectations.

¶ 53 This does not end the inquiry, though. Courts may refuse to enforce a term within a party's reasonable expectations if that term is unconscionable. *Broemmer*, 173 Ariz. at 151, 840 P.2d at 1016. A contract or term therein may be procedurally unconscionable—wrong in the bargaining process-or substantively unconscionable—wrong in the contract terms per se. *Phoenix Baptist Hosp. & Medical Center, Inc. v. Aiken*, 179 Ariz. 289, 293, 877 P.2d 1345, 1349 (App.1994). A contract may be deemed procedurally unconscionable when it is entered into hastily and/or in an emergency situation, when its terms are not explained at the time it is signed, and when the document does not call attention to terms to be enforced against the signing party. *See id.* at 294, 877 P.2d at 1350. Indications of substantive unconscionability include gross disparity in the values exchanged, unduly oppressive terms, and overall imbalance in the rights and protections of the parties. Restatement (Second) of Contracts § 208 (1981).

¶ 54 Unconscionability is a question for the court to determine as a matter of law. *Maxwell v. Fidelity Financial Services, Inc.*, 184 Ariz. 82, 87, 907 P.2d 51, 56 (1995). When a party claims a contract or a term therein is unconscionable, though, the parties must have an opportunity to present evidence of the circumstances and terms of the contract, and the court must make factual findings upon which it may base its ultimate finding on the issue. *Id.*

¶ 55 In opposition to Banner's motion for summary judgment, MSIC and the patients argued the price terms of the COAs were unconscionable. In support of this argument, the patients or their representatives who signed the COAs presented affidavits stating that they signed the COAs in emergency situations, while they were under stress caused by their medical conditions or the medical conditions of their dependents. Several of the patients stated in their affidavits that the COAs were not explained to them by the hospital personnel when they signed them, and that they believed that signing the COAs was a prerequisite to treat-

ment. Furthermore, MSIC submitted the deposition of Banner's Vice President of Finance, indicating that the cost-to-charge ratio for some medical treatments at Banner hospitals was as low as 19.77%.

¶ 56 These facts raise at least the specter of unconscionability as to the price terms in the COAs. Nonetheless, the superior court did not address the question of whether the price terms were unconscionable. After mistakenly finding the filed rates were the price terms of all the COAs, the court's sole comment as to the enforceability of those rates was, "There are no facts presented that support the claim that the rates were unreasonable." Unreasonability, however, is not the benchmark of unconscionability. The court conducted no findings or analysis as to the procedure in which the COAs were signed, nor is there any substantive inquiry in the ruling as to whether the price terms were grossly disparate between the parties or unduly oppressive.

¶ 57 The court's failure to enter such findings or to make a substantive ruling on unconscionability was error. MSIC argued the price terms in the COAs were unconscionable, and presented evidence in support of that argument. Thus, the court should have determined whether those terms were unconscionable. *Maxwell*, 184 Ariz. at 87, 907 P.2d at 56. Whether the price terms were unconscionable was determinative of whether Banner could obtain specific performance of the price terms, or whether its remedies were limited to a claim for damages. *See id.* at 88, 907 P.2d at 57. I would therefore reverse the ruling of the superior court and remand for a determination of whether the price terms of the COAs were unconscionable as alleged by MSIC.

¶ 58 Banner argues against such a result by contending that allowing courts to possibly determine a "reasonable rate" would destroy the entire health care system. This argument is over-stated. In most cases hospitals can avoid litigation of price terms simply by ensuring COAs expressly reference the filed rates. In those extraordinary cases in which the filed rates might be deemed procedurally unconscionable, hospitals may take appropriate steps to minimize or avoid such a

result, such as explaining to the patient or the person signing the COA what the agreement means. Even in those cases in which the filed rate might be deemed unconscionable, Banner's own concessions belie its doomsday argument that the entire health care system will be undermined. Banner conceded that it collects the filed rates from only approximately two percent of its patients. This fact undermines Banner's argument that, if it cannot charge and possibly collect its full filed rates from uninsured patients, the entire health care system will be destroyed. Indeed, hospital associations have attempted to develop formulas for reasonable rates to stem the increasing gap between the rates charged to persons not covered by any type of third-party payor contract and those who are covered, a rate one study has shown to have increased to a ratio of 2.5:1. Gerard F. Anderson, *From 'Soak the Rich' to 'Soak the Poor': Recent Trends in Hospital Pricing, 26* Health Affairs–The Policy Journal of the Health Sphere 780 (2007), *available at* http://www. healthaffairs.org/. Hospital organizations proposing to set rates for non-covered patients hardly is an indication that charging such patients anything less than full filed rates would destroy the health care delivery system.

¶ 59 Banner also contends that allowing courts to determine such rates would penalize third-party payors who had the foresight to contract discounted rates with Banner and would lead to a "race to the bottom," as insurers and third-party payors would insist on rates even lower than those previously negotiated. I disagree. Courts possibly determining reasonable rates in those rare cases where the filed rates referenced in the COAs were unconscionable would not "penalize" third-party payors who have negotiated price terms with a hospital. A court could very well determine rates which are greater than such negotiated rates. Moreover, third-party payor contracts would still offer potential subscribers the additional benefit of the security of knowing exactly what procedures would be covered and knowing their ultimate out-of-pocket exposure for healthcare. Remanding for further proceedings on the contract price terms therefore remains appropriate.

## CONCLUSION

¶ 60 I would hold that the superior court erred by finding that the filed rates were the price term for the COAs that did not explicitly refer to the filed rates. Further, I would hold that the superior court erred by failing to address whether the filed rates were an unconscionable price term, as alleged by MSIC and the patients. I would therefore reverse the court's order of summary judgment and remand for proceedings to determine an appropriate price term for the COAs that do not refer to the filed rates, and for findings of fact and conclusions of law as to whether the filed rates are an unconscionable price term. I therefore dissent from the majority's analysis that affirms the order of the superior court.